JACK P. DICANIO (SBN 138782)
jack.dicanio@skadden.com
AMY S. PARK (SBN 208204)
amy.park@skadden.com
PATRICK HAMMON (SBN 255047)
patrick.hammon@skadden.com
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
525 University Avenue
Palo Alto, California 94301
Telephone: (650) 470-4500
Facsimile:  (650) 470-4570

Attorneys for Plaintiff
TESLA MOTORS, INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| Tesla Motors, Inc., | CASE NO.: 5:16-cv-00288 |
| Plaintiff, | **COMPLAINT FOR:** |
| v. | 1)  DECLARATORY JUDGMENT |
| Hoerbiger Automotive Comfort Systems, LLC and Hoerbiger America Holding, Inc., | 2)  PROMISSORY ESTOPPEL |
| Defendants. | 3)  NEGLIGENT MISREPRESENTATION |
| | 4)  NEGLIGENCE |
| | **DEMAND FOR JURY TRIAL** |

1

**COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES**

**COMPLAINT**

1          Plaintiff Tesla Motors, Inc. ("TESLA"), by and through its undersigned attorneys, brings

2   this action against Defendant Hoerbiger Automotive Comfort Systems, LLC and Hoerbiger

3   America Holding, Inc. (collectively referred to as "HOERBIGER"),  alleging upon knowledge as

4   to its own acts and upon information and belief with respect to all other matters, as follows:

5          **NATURE OF THE ACTION**

6          1.   In February 2014, after extensive negotiations, TESLA and HOERBIGER entered into an

7   agreement entitled GENERAL TERMS AND CONDITIONS FOR PROTOTYPE OR

8   PRODUCTION – PARTS OR SERVICES ("the GTC").  The GTC established the legal

9   framework for a business relationship between TESLA and HOERBIGER with respect to the

10  development and production of a hydraulic actuation system to be used in the Falcon Wing doors

11  of TESLA'S highly anticipated Model X vehicle.  Among other things, the GTC sets forth the

12  binding terms and conditions that govern the parties' rights and responsibilities in the event

13  TESLA decides to issue a purchase order ("PO") to HOERBIGER or a dispute arises regarding the

14  parties' relationship.  By its terms, the GTC is incorporated into every PO that is issued.

15         2.   The GTC provides that TESLA may issue two types of POs to HOERBIGER: (1)

16  discrete purchase orders ("Discrete POs") for parts or services that are required in connection with

17  the *development* of a product, including for single ad hoc orders for prototype parts, and (2)

18  production purchase orders ("Production POs") for the future supply of production parts

19  conditioned upon the issuance of corresponding Releases as defined in the GTC.  The GTC does

20  not obligate TESLA to issue any POs and does not require TESLA to order a single part or service

21  from HOERBIGER, much less obligate TESLA to treat HOERBIGER as its exclusive supplier for

22  parts.  Nor does the GTC require that because TESLA chooses to issue some POs, it must issue

23  more.  In addition, the GTC provides that TESLA can cancel a PO at any time, with liability

24  expressly limited to the discrete categories set forth in the GTC.

25         3.   Following the parties' execution of the GTC and in accordance with its terms, TESLA

26  issued several Discrete POs to HOERBIGER relating to engineering, design and testing

27

28

2

1  (collectively referred to as "ED&T"), development of prototypes, and other discrete projects in

2  connection with the initial development phase of the actuation system for the Falcon Wing doors.

3      4.   TESLA did not issue any Production POs because the parties never entered the

4  production phase.  To move from the development phase to the production phase, vendors must go

5  through an extensive qualifying process to ensure that the prototypes are production-ready.  The

6  parties never entered the production phase because, although HOERBIGER had represented it

7  could produce a production-ready hydraulic actuation system, HOERBIGER failed to deliver a

8  product that met TESLA'S specifications or that fulfilled HOERBIGER'S promises.  On numerous

9  occasions, TESLA notified HOERBIGER of the multitude of defects with its product.  While

10  HOERBIGER insisted it could fix the problems, HOERBIGER failed to do so.

11      5.   Instead, HOERBIGER provided a product that never came close to being ready for

12  production.  For example, the system was prone to overheating, which caused it to shut down—

13  making the doors inoperable—when TESLA stress-tested a prototype vehicle.  The doors also did

14  not open with the speed or symmetry that TESLA required, including when a prototype vehicle

15  was parked at an incline or when the system was exposed to extreme temperatures.

16  HOERBIGER'S doors also "sagged" beyond TESLA'S specified tolerance levels.  Furthermore,

17  the product persistently leaked oil, both internally and externally, which, as HOERBIGER

18  acknowledged, was entirely unacceptable, negatively impacting performance as well as leaving

19  unsightly markings and stains inside the vehicle.  In sum, HOERBIGER'S prototype never came

20  close to fulfilling the promises made by HOERBIGER.  Ultimately, the deficiencies in

21  HOERBIGER'S product made it an unworkable engineering solution for the Falcon Wing doors of

22  the Model X.

23      6.   Accordingly, after enduring HOERBIGER'S defects and false assurances, paying for a

24  year of fruitless development work, and having incurred significant costs as a result of

25  HOERBIGER'S failed promises, TESLA decided to pursue an alternative supplier and engineering

26  design for the actuation system of the Model X Falcon Wing doors.  TESLA notified

27  HOERBIGER of this decision and paid HOERBIGER all sums due and owing to it.

28

**COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES**

1    7.  Since TESLA terminated this relationship, HOERBIGER has made a series of

2  unreasonable demands, including that TESLA was obligated to work with HOERBIGER for the

3  life of the Model X program and that TESLA owes HOERBIGER types of damages that are

4  specifically barred by the parties' agreement.

5    8.  TESLA brings this action in order to obtain a judicial declaration that TESLA is not in

6  breach of any contractual obligation to HOERBIGER and that TESLA owes nothing to

7  HOERBIGER.  TESLA also brings claims, in the alternative, for promissory estoppel, negligent

8  misrepresentation, and negligence to recover for HOERBIGER'S false representations, on which

9  TESLA relied to its detriment.

10                                **THE PARTIES**

11    9.  Plaintiff Tesla Motors, Inc. ("TESLA") is a Delaware corporation headquartered at 3500

12  Deer Creek Road in Palo Alto, California.  At all relevant times, TESLA was qualified to do

13  business in California.

14    10. Defendant Hoerbiger Automotive Comfort Systems, LLC is located in Auburn, Alabama

15  and is organized and existing under the laws of the State of Alabama.

16    11. Defendant Hoerbiger America Holding, Inc. is located in Deerfield Beach, Florida and is

17  organized and existing under the laws of the State of Florida.  Hoerbiger America Holding, Inc. is

18  the parent company of Hoerbiger Automotive Comfort Systems, LLC.  Defendants Hoerbiger

19  Automotive Comfort Systems, LLC and Hoerbiger America Holding, Inc. are collectively referred

20  to herein as "HOERBIGER."

21                          **JURISDICTION AND VENUE**

22    12. This is an action for declaratory relief, promissory estoppel, negligent misrepresentation,

23  and negligence.  This Court has jurisdiction over Tesla's claim for declaratory relief pursuant to 28

24  U.S.C. §§ 2201 and 2202.  This Court also has jurisdiction over the subject matter of this action

25  pursuant to 28 U.S.C. § 1332 because the Parties are citizens of different states and the amount in

26  controversy, the value of the right to be protected, and/or the extent of the injury to be prevented in

27  this action exceeds $75,000.

28

**COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES**

13. HOERBIGER has established minimum contacts with this forum such that the exercise of personal jurisdiction over HOERBIGER will not offend traditional notions of fair play and substantial justice.   In particular, HOERBIGER has committed such purposeful acts and/or transactions in the State of California that it reasonably knew and/or expected that it could be sued in a California court as a consequence of such activity.   Moreover, HOERBIGER has purposefully availed itself of the benefits and protections of the State of California by entering into and executing agreements with TESLA relating to business ultimately to be conducted within the state. Furthermore, under the GTC, HOERBIGER irrevocably submitted to exclusive jurisdiction in the federal courts sitting in the Northern District of California and the state courts sitting in Santa Clara County, California for all disputes arising under or relating to the GTC.  (**Exhibit A** at §§ 19.1, 19.2, and 22.15.)

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the events giving rise to the claims raised in this lawsuit occurred in this judicial district. Moreover, under the GTC, HOERBIGER expressly agreed that the federal courts in the Northern District of California and the state courts in Santa Clara County shall be the exclusive venues for any dispute arising under or relating to the GTC, and irrevocably waived any and all objections it might have to venue in either such court.  (**Exhibit A** at §§ 19.1, 19.2, and 22.15.)

15. Assignment to the San Jose Division of this District is proper pursuant to Local Rule 3-2(c) because a substantial part of the events giving rise to the claims raised in this lawsuit occurred in Santa Clara County.

## FACTUAL BACKGROUND

### TESLA CONTEMPLATES USING HYDRAULIC PARTS ON THE FALCON WING DOORS OF ITS MODEL X VEHICLE

16. TESLA is an American automotive and energy storage company headquartered in Palo Alto, California.  TESLA designs, manufactures, and sells electric cars, electric vehicle powertrain components, and battery products.  TESLA is best known for revolutionizing the automobile industry by introducing electric vehicles that feature cutting-edge technology and designs.

17. In or around 2011, TESLA set out to expand its line of electric cars by developing the

COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

Model X, a state-of-the-art full-size crossover SUV.  The prototype was unveiled at TESLA'S Design Studio in Los Angeles on February 9, 2012.  Among many other groundbreaking design features, the Model X can be recognized by its signature Falcon Wing doors, which open vertically over the vehicle, rather than outwardly like traditional car doors.

18. The early design of the Model X Falcon Wing doors contemplated the use of hydraulic parts.  The need for design and production services pertaining to these hydraulic parts led TESLA to several suppliers in the field of hydraulic systems, one of which was HOERBIGER.

### HOERBIGER ASSURES TESLA OF ITS EXPERTISE AND AGREES TO BEAR FINANCIAL RISK IN ORDER TO WIN THE COVETED MODEL X BUSINESS

19. To obtain bids from potential suppliers, TESLA issued a Request For Quotation ("RFQ") regarding the use of hydraulic parts in the Falcon Wing doors of the Model X.  TESLA'S RFQ presented an important opportunity for a hydraulics company like HOERBIGER.  TESLA is a well-regarded and high-profile company selling premium vehicles that have frequently won awards and been featured in the press.  The Model X, for example, was featured in countless articles, automobile discussion groups, and both high-tech and clean-tech blogs alike, years before the vehicle was even available to the general public for purchase.  Some in the industry have identified it as "one of the most eagerly awaited vehicles in recent memory."  As a result, TESLA'S RFQ provided HOERBIGER a unique opportunity to be part of an exciting and high-profile project that was poised to generate headlines and positive press.  Indeed, HOERBIGER described the opportunity as potentially being one of the company's "North American Milestones."

20. The RFQ also presented HOERBIGER with a lucrative opportunity because of the potential high-volume nature of the project.  TESLA'S early product forecasts anticipated significant future demand for the Model X, for which TESLA has tens of thousands of outstanding reservations.  Furthermore, the Model X, unlike many other cars that use hydraulic parts, would have required eight actuation systems per vehicle (two primary and two secondary hydraulic actuators per door).  Accordingly, this was a high-value opportunity due to the substantial demand for the Model X and the vehicle's unique engineering specifications.

**COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES**

21. HOERBIGER and other bidders fiercely competed for the opportunity to supply the actuation system for the Model X Falcon Wing doors – a competition that HOERBIGER conceded was a "very demanding five month concept competition phase."  Each bidder engaged in lengthy negotiations with TESLA over several months in their respective attempts to win the opportunity to do business relating to the Model X vehicle.

22.     TESLA entered into preliminary discussions with HOERBIGER in large part due to HOERBIGER'S claims regarding its experience in the field of hydraulics.  During the parties' discussions, HOERBIGER boasted of its expertise concerning hydraulic systems and parts as well as its vast experience designing and manufacturing hydraulic systems for numerous automakers.

23.     These representations were important to TESLA because securing a supplier that could satisfy TESLA'S specifications and deliver a high quality product of the kind for which TESLA was known was critical to the success of the project.  The value TESLA placed on HOERBIGER'S claimed expertise and ability to deliver high quality work was communicated to HOERBIGER during the parties' discussions.  Accordingly, HOERBIGER had full knowledge of these matters.

24.     During the initial discussions and throughout the term of the parties' relationship, HOERBIGER assured TESLA that HOERBIGER could meet TESLA'S specifications and provide a functional and production-ready hydraulic actuation system for use in the Model X Falcon Wing doors.  Indeed, HOERBIGER was adamant that it could and would deliver a system that would perform according to TESLA'S control and durability requirements.

25. During their negotiations regarding the business terms of their potential arrangement, the parties discussed (among many other terms) allocation of financial risk between the parties.  It was critical to TESLA that it would not be held financially responsible for its supplier's costs, losses, or expenditures in the event it decided to pursue a different engineering solution or a different supplier for the actuation parts in the Model X Falcon Wing doors.  This was a necessary condition for TESLA and one which HOERBIGER expressly accepted (as reflected in Section 20 of the GTC) in order to be considered for this high-profile and high-volume opportunity.

7

1    26. HOERBIGER was well aware of the existence—and implications—of the risk allocation

2    to which it was agreeing.  Indeed, during one exchange between the parties, HOERBIGER

3    requested that TESLA delete Section 20 of the GTC limiting TESLA'S liability (discussed *infra*).

4    But because of the importance of this provision to TESLA, TESLA insisted that the provision

5    "must remain" in the document.  Despite HOERBIGER'S initial request that this provision be

6    stricken, HOERBIGER acceded to this term and executed the GTC containing Section 20 limiting

7    TESLA'S liability.

8    27. Ultimately, TESLA chose to move forward with HOERBIGER in connection with the

9    development of actuation parts in the Model X's Falcon Wing doors.  TESLA made this decision

10   because of HOERBIGER'S claimed expertise in hydraulics, representations made in the

11   competitive bidding process, its efficient packaging proposal, its proposed cost structure, and its

12   agreement that it (and *not* TESLA) would bear the financial risk associated with the possibility that

13   TESLA might ultimately choose not to purchase parts from HOERBIGER.

14                    **THE PARTIES ENTER INTO THE GTC**

15   28. On February 14, 2014, after months of negotiations, the parties entered into the GTC

16   (**Exhibit A**.)  As set forth above, the GTC provides the legal framework for the parties' business

17   relationship and the legally binding terms and conditions that apply if POs were to be issued or a

18   dispute were to arise regarding the parties' relationship.  The GTC authorizes TESLA to issue two

19   types of POs:  Discrete POs for parts or services that are required in connection with the

20   *development* of a product, including for single ad hoc orders for prototype parts, and Production

21   POs for the supply of production-ready parts.  Under the express terms of the GTC, each PO issued

22   by TESLA and accepted by HOERBIGER, together with the GTC, forms a separate, distinct, and

23   standalone "Contract" for the parts and/or services described in the PO.  (**Exhibit A** at §1.4.)  Each

24   PO incorporates, and is subject to, the GTC.  (*Id.*)

25   29. The GTC also expressly provides which documents can—and cannot—be included

26   within the scope of each Contract.  (**Exhibit A** at §1.4.)  Specifically, the GTC limits this scope to

27   (i) the terms of the GTC itself, (ii) the applicable Discrete or Production PO, (iii) documents and

28

**COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES**

1   attachments specifically referenced in the relevant purchase order, and (iv) any "other additional

2   written agreements" that are signed by both parties (collectively referred to in the GTC as the

3   "Contract Documents") (*Id.* at §§1.4 and 22.)  The GTC does not allow any other documents or

4   representations to be included within the scope of a Contract.  To be sure, the GTC has an

5   integration clause that specifically excludes oral communications and unsigned documents from

6   being incorporated into any of the Contracts.  (*Id.* at §21.10.)

7                    **A.    Discrete Purchase Orders**

8        30. As to the development phase of the project, the GTC authorizes TESLA to issue Discrete

9   POs to HOERBIGER for "Goods or Services including development [of] parts and/or development

10  services."  (**Exhibit A** at §1.2(a)(ii).)  Discrete POs are purchase orders for parts or services that

11  are required in connection with the *development* of a product, including for single ad hoc orders for

12  prototype parts.  Each Discrete PO incorporates, and is subject to, the GTC and constitutes an

13  individual stand-alone Contract.  (*Id.* at §1.4.)  TESLA has the right to cancel a Discrete PO at any

14  time.  (*Id.* at §1.5(a).)  Upon such cancellation, HOERBIGER must stop all work under the

15  applicable PO.  (*Id.*)

16                   **B.    Production Purchase Orders**

17       31. The GTC also authorizes TESLA, if it so chooses, to issue Production POs for parts to be

18  used in vehicle *production*.  As with Discrete POs, each Production PO would incorporate and be

19  subject to the GTC and constitute an individual stand-alone Contract.  (**Exhibit A** at §1.4.)  Before

20  issuing a Production PO, TESLA requires its suppliers to successfully demonstrate that its

21  proposed part complies with TESLA'S industry-standard Production Part Approval Process

22  ("PPAP") as required under the GTC.  During this process, TESLA'S engineers perform a full and

23  final review of the proposed part to ensure that it meets all of TESLA'S technical requirements.

24  Once the product is approved, TESLA may then issue a Production PO.  Production POs typically

25  identify the part ID and TESLA'S non-binding forecasted need for that part over a specified period.

26  They do not, however, typically contain the applicable pricing terms.

27       32. In the GTC, the parties agreed that Production POs are not binding agreements to order

28

or purchase parts.  The GTC states: "Quantities referenced in any Production PO represent TESLA'S estimate of its anticipated needs for such Products during the timeframe referenced in such Production PO and are provided for Seller's *planning purposes only*."  (**Exhibit A** at §1.1(b) (emphasis added).)  TESLA is only obligated to purchase parts under a Production PO if and to the extent TESLA issues a corresponding Release (also referred to as "call off schedule"), which specifies quantities and delivery dates, against a particular Production PO.  (*Id.* §§1.2(b), 1.2(c), 1.5(b), 1.5(c).)  TESLA has the right to cancel a Discrete PO at any time.  (*Id.* at §1.5(a).)

33. As set forth below, because HOERBIGER never came close to providing a production-ready hydraulic actuation system, TESLA never issued any Production POs or corresponding Releases to HOERBIGER.

### C.  No Obligation To Order Parts Or Services

34. The GTC does not obligate TESLA to issue any POs or purchase a single part or service.  (**Exhibit A** at §1.5.)

35. Furthermore, TESLA can cancel a PO at any time for any reason, with liability expressly limited to the discrete categories set forth in the GTC.  (**Exhibit A** at §12.4(a).)

### D.  Hoerbiger's Exclusive Remedies Under The GTC

36. Section 12.4 of the GTC sets forth the only types of damages that are recoverable by HOERBIGER in the event a Contract is breached.  (**Exhibit A** at §12.4(a).)  Those damages are expressly limited to: (1) the purchase price for all conforming "Products" received by TESLA; (2) amounts owed for "Transition Support"; (3) certain raw materials and components that were purchased in order to meet the requirements of the relevant Release; and (4) any amounts owed pursuant to a Production Pricing Agreement.  (*Id.* at §§12.4(a)(i)-(iv).)  These damages, however, are not available to a supplier as a matter of right.  Nor are they available if TESLA decides to order parts from a different supplier or if it simply declines to order any parts in the first place.  They are only available in the event TESLA defaults or otherwise breaches a Contract.

37. Section 12.4 of the GTC further provides that the payment of these amounts "complete[ly] and final[ly] satisf[ies] . . . any and all liabilities relating to the Contract."  (*Id.*)  Pursuant to the

1  GTC, these cost categories are the *only* damages that HOERBIGER could recover in the event of a

2  breach by TESLA.

3          E.      **Express Limitations On Tesla's Liability**

4        38. In addition to identifying the *only* cost categories that would be recoverable in the event

5  of a contractual breach, the GTC also sets out, in clear and unambiguous terms, certain types of

6  damages for which TESLA may not be held liable under any circumstances.  Section 20, entitled

7  "Tesla Limitation of Liability," expressly precludes HOERBIGER from recovering any

8  consequential damages, anticipated profits, or incidental damages, as well as all other costs,

9  expenses, and losses:

10  <u>In no event will Tesla be liable for anticipated profits, interest, penalties or incidental, consequential, punitive, multiple, or exemplary damages or liabilities</u> in connection with the Contract, whether for breach of contract, late payment, property damage, personal injury,

11  illness, or death or otherwise.  In addition and without limiting any of the foregoing, <u>Tesla will have no obligation for and will not be required to pay Seller, directly or on account of</u>

12  <u>claims by Seller's subcontractors, for loss of anticipated profit, failure to realize anticipated production volumes, revenues or savings, unabsorbed overhead, interest on claims, product</u>

13  <u>development and engineering costs, tooling, facilities and equipment rearrangement costs or rental, unamortized capital or depreciation costs, or general administrative burden charges</u>

14  <u>from termination of the Contract . . . .</u>

15  (**Exhibit A** at §20 (emphasis added).)

16          **THE PARTIES' PERFORMANCE UNDER THE GTC**

17          A.      **Tesla Issues Nine Discrete POs**

18        39. Between February 2014 and May 2015, TESLA issued nine Discrete POs to

19  HOERBIGER for parts and services in connection with the development of hydraulic parts for the

20  Model X Falcon Wing doors, including tooling expenses, engineering, design and testing

21  ("ED&T"), and various prototypes and builds.  Each Discrete PO constituted a separate Contract

22  between the parties, which incorporated the GTC and other applicable Contract Documents.

23        40. HOERBIGER issued more than two dozen invoices in connection with the nine Discrete

24  POs, totaling approximately $3 million.  TESLA has paid HOERBIGER all amounts invoiced.

25          B.      **Hoerbiger Delivers Defective Prototypes**

26        41. Between March 2014 and May 2015, pursuant to the nine Discrete POs, HOERBIGER

27  provided TESLA with several iterations of the proposed hydraulic actuation system.  During this

28

**COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES**

1  process, TESLA discovered several fundamental problems with the proposed system.  For example,

2  the system was prone to overheating, which caused it to shut down—making the doors

3  inoperable—when stress-tested by TESLA.  The doors also did not open with the speed or

4  symmetry that TESLA required, including when a prototype vehicle was parked at an incline or

5  when the system was exposed to extreme temperatures.  HOERBIGER'S doors also "sagged"

6  beyond TESLA'S specified tolerance levels.  Furthermore, the product persistently leaked oil,

7  which, as HOERBIGER acknowledged, was entirely unacceptable, negatively impacting

8  functionality and aesthetics.

9       42. Serious questions also arose regarding the system's impact on the Model X assembly

10 process and overall cost of the system.  For example, the unanticipated complexity in integrating

11 the system into the vehicle, which was caused by HOERBIGER'S defective workmanship and its

12 failure to properly apprise TESLA of the logistics concerning installation of the actuator,

13 significantly increased the vehicle's assembly time.  It also caused the prospective cost of the

14 system to increase to levels far greater than what HOERBIGER had led TESLA to expect.

15      43. TESLA repeatedly advised HOERBIGER of these issues and attempted to work with

16 HOERBIGER to fix them.  In response, HOERBIGER assured TESLA that it could and would fix

17 the problems and provide a product that would meet TESLA'S specifications and that was

18 production-ready, but failed to do so.  TESLA relied on HOERBIGER and believed HOERBIGER

19 could deliver on its promises.

20      44. Although the product delivered by HOERBIGER during the development process was

21 defective, TESLA nevertheless paid HOERBIGER millions of dollars because HOERBIGER

22 continued to assure TESLA it would resolve the issues.  TESLA relied on these assurances and

23 continued to work with HOERBIGER during what ultimately proved to be more than a year of

24 wasted development efforts.

25            **C.    The Production Pricing Agreement**

26      45. In March 2014, the parties prepared a Production Pricing Agreement ("PPA"), a

27 precursor to a Production PO that TESLA might later choose to issue.  As noted above, Production

28

12

**COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES**

1 POs generally do not contain product pricing.  Accordingly, a PPA is typically issued in

2 conjunction with, and generally prior to TESLA'S issuance of, a Production PO.

3     46. The PPA, which was not signed by both parties, did not impose any obligations upon

4 TESLA.  Instead, it confirmed the target prices the parties negotiated during the bidding process so

5 TESLA could be assured that the part under development would be correctly priced in the event it

6 were to qualify for production and TESLA were to issue a Production PO and corresponding

7 Release as contemplated under the GTC.

8     47. TESLA and HOERBIGER understood that the PPA in and of itself would not be an

9 agreement to order or manufacture products.  Indeed, the PPA, consistent with the GTC, reinforces

10 that TESLA was not obligated to order any parts from HOERBIGER.  The PPA specifically states:

11 "*Supplier acknowledges that the production volume shown in this agreement is provided for*

12 *planning purposes only and is not a volume guarantee . . . .*"  (emphasis added.)  The PPA makes

13 clear that "quantities" and "delivery dates" would only become "binding" if they were "specified in

14 the individual call off schedules issued by TESLA" (*i.e.*, "Releases" as that term is used in the

15 GTC).  Moreover, the PPA expressly disclaims any and all potential liability premised on TESLA's

16 decision *not* to order parts:  "*Tesla shall have no liability for failure to order the forecasted*

17 *volumes.*" (emphasis added.)

18     48. As a result of HOERBIGER'S failures described above, TESLA determined not to enter

19 into the production phase with any HOERBIGER product and thus did not issue any Production

20 POs or Releases to HOERBIGER.

21

22               **TESLA DECIDES TO USE ELECTROMECHANICAL,**
               **RATHER THAN HYDRAULIC, PARTS**

23     49. By May 2015, it became clear that HOERBIGER could not deliver a product consistent

24 with TESLA'S specifications and requirements as HOERBIGER repeatedly promised.

25     50. Accordingly, after paying HOERBIGER for fruitless development work, TESLA made

26 the decision to pursue a more traditional engineering solution in connection with the Falcon Wing

27 doors.  TESLA understood that changing the technical specifications of the actuation system for

28

**COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES**

1 the Falcon Wing doors would likely create further cost beyond what HOERBIGER'S failures had

2 already caused.  But TESLA concluded this change was necessary, since after a year of wasted

3 efforts, it no longer believed that HOERBIGER could deliver a hydraulic system that it promised

4 and which would satisfy TESLA'S requirements.  Accordingly, TESLA notified HOERBIGER of

5 its decision to use electromechanical parts, instead of hydraulic ones, and thus revised the

6 engineering design of the Falcon Wing doors.

7      51. Since TESLA terminated this relationship, HOERBIGER has made a series of

8 unreasonable demands, including that TESLA was obligated to work with HOERBIGER for the

9 life of the Model X program and that TESLA owes HOERBIGER types of damages that are

10 specifically barred by the parties' agreement.

11

12 **FIRST CAUSE OF ACTION**
**(For Declaratory Relief)**

13      52. Plaintiff incorporates paragraphs 1 through 50, inclusive, by reference as though set forth

14 in full.

15      53. The Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, authorizes this Court to issue a

16 declaratory judgment.

17      54. There is a justiciable and actual controversy between TESLA and HOERBIGER with

18 respect to the parties' rights and obligations under the documents described herein that is ripe for

19 adjudication by the Court.

20      55. Despite TESLA'S performance in full of its obligations to HOERBIGER, a dispute has

21 arisen as to whether TESLA was contractually obligated to purchase production parts from

22 HOERBIGER and whether HOERBIGER is entitled to recover for TESLA'S decision not to

23 purchase such parts.

24      56. TESLA paid HOERBIGER in full all amounts invoiced under the Discrete POs and thus

25 owes HOERBIGER nothing for any parts or services provided during the development phase.

26 TESLA likewise owes HOERBIGER nothing for any parts or services under the production phase.

27 Because HOERBIGER never came close to providing a production-ready hydraulic actuation

28

14

**COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES**

1    system, the parties never even entered into the production phase.  Per the express terms of the GTC

2    and as reflected in the PPA, TESLA has no obligation to purchase any parts or services from

3    HOERBIGER whatsoever, whether such parts or services relate to the development or production

4    phase of a project.  Accordingly, TESLA committed no contractual breach.

5        57. Moreover, even if there had been a breach, Section 12.4 of the GTC sets forth the *only*

6    cost categories that HOERBIGER could seek.  TESLA does not owe any amount under any of

7    these categories.

8        58. The parties endeavored to resolve their disputes through the dispute resolution procedures

9    set forth in the GTC, but were unsuccessful.  Because HOERBIGER has not relented in its claims,

10   the parties remain at an impasse necessitating the intervention of the Court to clarify the parties'

11   rights and obligations.

12       59. Based on the facts and circumstances alleged herein, TESLA is entitled to a judicial

13   declaration that (1) TESLA is not in breach of any contractual obligation to HOERBIGER, and (2)

14   TESLA owes HOERBIGER nothing.

15                      **SECOND CAUSE OF ACTION**
                        **(For Promissory Estoppel)**

16       60. Plaintiff incorporates paragraphs 1 through 58, inclusive, by reference as though set forth

17   in full.

18       61. In the alternative, TESLA alleges that HOERBIGER promised that it would be able to

19   provide a production-ready part that complied with TESLA'S specifications and requirements.

20       62. As explained above, HOERBIGER did not do this.  Instead, HOERBIGER provided

21   TESLA with defective prototypes that that did not come close to being production-ready.

22       63. Despite these deficiencies, for a year HOERBIGER represented and reassured TESLA

23   that it would be able to address and fix these problems, but failed to do so.

24       64. As set forth above, TESLA relied on these promises.

25       65. TESLA'S reliance was reasonable, justifiable, and foreseeable.

26       66. As alleged above, HOERBIGER breached these promises.

27       67. As a direct and proximate cause of HOERBIGER'S false promises, TESLA incurred

28

                                    15

1  millions of dollars in damages, including, but not limited to (i) costs of re-tooling the entire vehicle

2  in order to support a different engineering solution, (ii) costs that were sunk into testing the Model

3  X vehicle that embodied the HOERBIGER hydraulic part, (iii) premium payments that TESLA

4  needed to pay a new supplier to provide alternative electromechanical parts within TESLA'S

5  timeline for production, and (iv) costs associated with the business disruption within TESLA'S

6  sourcing, engineering, and business teams caused by HOERBIGER'S inability to fulfill its

7  promises.

8  ### THIRD CAUSE OF ACTION
### (For Negligent Misrepresentation)

9  68. Plaintiff incorporates paragraphs 1 through 66, inclusive, by reference as though set forth

10  in full.

11  69. In the alternative, TESLA alleges that HOERBIGER, orally and in writing, represented to

12  TESLA that it would be able to provide a production-ready part that complied with TESLA'S

13  specifications and requirements.

14  70. As set forth above, HOERBIGER had no reasonable basis for believing these

15  representations were true when it made them to TESLA.  Indeed, HOERBIGER made these

16  representations recklessly, carelessly, and negligently, in order to be selected as a supplier for

17  TESLA.

18  71. As set forth above, TESLA reasonably, justifiably, and reasonably relied on these false

19  representations.

20  72. As a direct and proximate cause of HOERBIGER'S negligent misrepresentations,

21  TESLA incurred millions of dollars in damages, including, but not limited to (i) costs of re-tooling

22  the entire vehicle in order to support a different engineering solution, (ii) costs that were sunk into

23  testing the Model X vehicle that embodied the HOERBIGER hydraulic part, (iii) premium

24  payments that TESLA needed to pay a new supplier to provide alternative electromechanical parts

25  within TESLA'S timeline for production, and (iv) costs associated with the business disruption

26  within TESLA'S sourcing, engineering, and business teams caused by HOERBIGER'S inability to

27  fulfill its promises.

28

**COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES**

**FOURTH CAUSE OF ACTION**
**(For Negligence)**

73. Plaintiff incorporates paragraphs 1 through 71, inclusive, by reference as though set forth in full.

74. In the alternative, TESLA alleges that at all times relevant herein, HOERBIGER owed a duty of care to TESLA by virtue of holding itself out as a capable supplier and an expert in the field of hydraulics and because of its promises that it would be able to provide a production-ready part that complied with TESLA'S specifications and requirements.

75. As set forth above, in failing to provide products consistent with these promises while falsely reassuring TESLA that it would be able to address the problems with its proposed part, HOERBIGER breached the duty of care it owed to TESLA.

76. As a direct and proximate cause of HOERBIGER'S negligence, TESLA incurred millions of dollars in damages, including, but not limited to (i) costs of re-tooling the entire vehicle in order to support a different engineering solution, (ii) costs that were sunk into testing the Model X vehicle that embodied the HOERBIGER hydraulic part, (iii) premium payments that TESLA needed to pay a new supplier to provide alternative electromechanical parts within TESLA'S timeline for production, and (iv) costs associated with the business disruption within TESLA'S sourcing, engineering, and business teams caused by HOERBIGER'S inability to fulfill its promises.

**PRAYER FOR RELIEF**

WHEREFORE, TESLA prays that a judgment be entered against HOERBIGER as follows:

1. For a judicial declaration that: (i) TESLA is not in breach of any contractual obligation to HOERBIGER, and (ii) TESLA owes HOERBIGER nothing;

2. For compensatory, special, and general damages in favor of TESLA in an amount to be determined at trial;

3. For punitive damages in an amount to be determined at trial;

4. For pre-judgment interest on any recovery by TESLA;

5. For costs of suit incurred herein; and

17

6.      For such other and further relief as this Court may deem just and proper.

DATED:  January 19, 2015.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

By: _____ /s/ Jack P. Dicanio _____

JACK P. DICANIO
Attorneys for Plaintiff
TESLA MOTORS, INC.

## DEMAND FOR JURY TRIAL

TESLA demands a trial of its claims by jury to the extent authorized by law.

DATED:  January 19, 2015.

SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

By: _____ /s/ Jack P. Dicanio _____

JACK P. DICANIO
Attorneys for Plaintiff
TESLA MOTORS, INC.

COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES