# Exhibit A

**Tesla Motors, Inc.**

**General Terms and Conditions for Prototype or Production**

**Parts or Services**

These General Terms and Conditions for Prototype or Production Parts or Services (the "*General Terms*") are entered into effective as of February 14, 2014 ("*Effective Date*") by and between Tesla Motors, Inc., a Delaware corporation located at 3500 Deer Creek Road, Palo Alto, California, 94304 ("*Tesla*") and Hoerbiger Automotive Comfort Systems, LLC, a corporation, duly organized under the laws of Alabama and located at 284 Enterprise Drive, Auburn, Alabama, 36830 ("*Seller*").  Tesla and Seller are each referred to herein as a "*Party*" and collectively referred to herein as the "*Parties*."

**PURPOSE**

Tesla desires to engage Seller to develop, supply, and support products for use in Tesla Products.  These General Terms shall govern the relationship of the Parties.

1.  **The Contract.**

    1.1   *Definitions.*  Defined terms shall have the meaning set forth in these General Terms, including as stated in Section 22.

    1.2   *Offer.*

    a)  <u>Purchase Orders Generally.</u>  Tesla may issue to Seller a purchase order for Tesla's anticipated needs for:  (i) Products over the next twelve (12) calendar months or such other period as Tesla shall determine from time to time (such purchase order to be referred to as a "*Production PO*"), and/or (ii) other Goods or Services including development parts and/or development services (such purchase order to be referred to as a "*Discrete PO*").

    b)  <u>Effect of Production POs.</u>  Quantities referenced in any Production PO represent Tesla's estimate of its anticipated needs for such Products during the timeframe referenced in such Production PO and are provided for Seller's planning purposes only. Tesla's liability for purchase of quantities referenced in such Production POs are limited as set forth in Section 1.5 and elsewhere in these General Terms.  By accepting a Production PO, Seller agrees it is willing and able to provide all quantities referenced in such Production PO during the period referenced in such Production PO.

    c)  <u>Order Process Under Production POs.</u>  An Authorized Purchaser may issue Releases against a Production PO to Seller, specifying quantities and delivery dates for Products referenced in such Purchase Order.  Each Release may be issued on a rolling basis.  Each Release is binding to the extent set forth in Section 1.5.

    1.3   *Acceptance.*

    a)  Seller will respond within ten (10) business days accepting or rejecting any Purchase Order. If Seller cannot meet the terms set forth in such Purchase Order, Seller will inform Tesla and propose alternative terms.  If Tesla accepts such alternative terms, Tesla shall issue a revised Purchase Order that includes such alternative terms.  Alternative terms are expressly rejected unless incorporated into a Purchase Order.  Seller will be deemed to have accepted the Purchase Order if Seller:  (a) provides written acceptance (which acceptance may occur via an electronic data interface), or (b) commences or continues delivery of Goods or provision of Services referenced in the Purchase Order, or (c) with respect to a Production PO, fails to object within ten (10) business days (any of the foregoing in Subsections (a), (b), or (c) of this Section 1.3 will be deemed an "*Acceptance*").

    b)  <u>Releases.</u>  Seller shall accept each Release to the extent it conforms to the terms of these General Terms. Seller may only reject a Release to the extent it fails to conform to the terms of these General Terms.  Seller will be deemed to have waived these objections and accepted the Release if

Seller fails to object to the Release in writing within two (2) business days after receipt of such Release. If Seller cannot deliver by the date(s) specified in the Release, Seller shall immediately propose a revised date that is at or before the Lead Time from the date of the Release.

1.4   *Terms of the Contract.* Upon the earlier of (a) both Parties' signature to these General Terms, or (b) Seller's Acceptance, the terms of the relevant Purchase Order (if any), together with the terms in the other Contract Documents will become a binding contract between Tesla and Seller (collectively, the "**Contract**"). Acceptance is expressly limited to the terms provided by the Contract. Terms in any invoice and any other modifications, counterproposals, or counteroffers proposed by Seller to a Purchase Order or Release are expressly rejected and shall not become part of the Contract.

1.5   *Purchase Order/Release Liability.*

a) <u>Discrete POs</u>. Subject to Tesla's obligations in this Section, Tesla may at any time cancel all or any part of a Discrete PO. Upon any such cancellation, Seller will, to the extent and at the times specified by Tesla, stop all work pertaining to the cancelled portion of the Discrete PO, incur no further costs, and protect all property in which Tesla has or may acquire an interest. Tesla will not be responsible for any costs in connection with a cancelled Discrete PO except for payment of: (i) the portion of the finished Goods manufactured and/or Services performed prior to notice of the cancellation and delivered to Tesla thereafter, provided that such Goods and/or Services meet all of the Specifications and requirements of the Contract; (ii) unfinished Goods which are work-in-process (if any); (iii) raw materials and components (if any) that were purchased by Seller in order to meet the requirements of the Discrete PO and that: (A) met all of the relevant Specifications under the Contract; (B) were ordered no earlier than applicable Lead Times of the materials and components in order to meet the delivery dates specified in the Discrete PO; and (C) could not be returned for a refund or credit or used for or sold to any of Seller's other customers.

b) <u>Production Purchases; Releases</u>. An Authorized Purchaser may reschedule or cancel all or any portion of any Release issued by such Authorized Purchaser upon written notice. Such written notice may occur via an electronic data interface system. Upon any such cancellation, Seller will, to the extent and at the times specified by Tesla, stop all work pertaining to the cancelled portion of the Release, incur no further costs, and protect all property in which Tesla has or may acquire an interest. The Authorized Purchaser's only liability for rescheduling any Release shall be to pay (as provided for herein) for Products that are to be delivered under the Release within the first four (4) weeks covered by such Release or the agreed Lead Time set forth in the applicable Production Pricing Agreement, if any. The Authorized Purchaser's only liability for cancelling any Release shall be to pay for: (i) the portion of the finished Goods manufactured and/or Services performed prior to notice of the cancellation provided that such Goods and/or Services meet all of the Specifications and requirements of the Contract; (ii) unfinished Goods which are work-in-process (if any); (iii) raw materials and components (if any) that were purchased by Seller in order to meet the requirements of the Release and that: (A) met all of the relevant Specifications under the Contract; (B) were ordered no earlier than applicable Lead Times of the materials and components in order to meet the delivery dates specified in the Release; and (C) could not be returned for a refund or credit or used for or sold to any of Seller's other customers; (iv) costs set forth in the applicable Production Pricing Agreement, mutually agreed and signed by both parties .

c) <u>Purchase Order Disclaimer</u>.  TESLA MAKES NO WARRANTIES REGARDING THE QUANTITY OF PRODUCTS THAT IT OR ANY OTHER AUTHORIZED PURCHASERS WILL ORDER, IF ANY. QUANTITIES REFERENCED IN A PURCHASE ORDER OR RELEASE OR IN DISCUSSIONS ARE NON-BINDING, EXCEPT TO THE EXTENT PROVIDED IN SECTION 1.5.

1.6   *Changes.*

a) Seller will not make any change to the Products, its manufacturing process or its suppliers except at Tesla's written instruction or with Tesla's written approval, which shall not be unreasonably delayed or withheld. If Seller learns of a possible change that may reduce costs, improve quality or otherwise be beneficial to Tesla, Seller will inform Tesla of the possible change.

b) Both Parties reserve the right to propose a change to the Products, including the design, Specifications, materials, packaging, testing requirements, shipping date, or time or place of delivery. If a change to Products is requested or approved by Tesla, Seller shall notify Tesla in writing within ten (10) business days of such request or approval and prior to making the change if such change will affect cost or timing and provide the basis for such determination. Tesla and Seller will negotiate in good faith on an equitable price adjustment (up or down) or other appropriate adjustment. In doing so, the Parties agree to use commercially reasonable efforts to maintain Seller's profit margin, as established by Seller records provided to Tesla.

2. **Goods.**

2.1 *Quantity.* Quantities and delivery dates shall be as stated in the applicable Purchase Order or Release, unless otherwise agreed to in writing by the Parties pursuant to Section 1.6 or in the other Contract Documents.

2.2 *Service Requirements.*

a) During the Production Period and for ten (10) years thereafter (such 10-year period shall be referred to as the *"Service Period"*), Seller will sell Products to Authorized Purchasers to fulfill service requirements. Unless otherwise agreed in writing to by Tesla, the price(s) for the Products during the first three (3) years of the Service Period will be those prices that were in effect at the end of the Production Period. For the remaining seven (7) years of the Service Period, the prices(s) for Products will be as agreed upon by the Parties.

b) During the Production Period as well as the Service Period, if an Authorized Purchaser desires to purchase components or parts of Products, Seller will sell each component or part of the Product at an equitable price that reflects the cost of the component or part less assembly costs, plus a markup commensurate with that on the related Product and any actual cost differential for packaging and assembly or manufacturing.

c) Tesla shall have the option to designate a different delivery location for service parts.

d) After the end of the Production Period, Seller agrees to maintain (i) the Tooling for the anticipated remaining life of such Tooling pursuant to a Tooling Maintenance and Replacement Schedule mutually agreed upon by the parties on or before commencement of the Service Period, and (ii) an adequate stock of materials and supplies needed to produce new service parts throughout the Service Period if the Parties reasonably anticipate that such materials and supplies will not be readily available during the Service Period.

2.3 *Shortage of Supply.* If Seller has reason to believe that its ability to deliver any Products is or may be constrained, Seller shall immediately notify Tesla setting forth the cause for the anticipated delay. Any oral communication shall be immediately confirmed in writing. During the period of any delay, Seller shall use commercially reasonable efforts to fulfill Authorized Purchaser's Releases prior to fulfilling orders for the same or similar Products for any of Seller's other customers for the period in which Seller's production is constrained. The provisions of this Section 2.3 are in addition to all of Seller's other obligations under the Contract and are in addition to all of Tesla's other rights and remedies provided at law, in equity and in the Contract.

3. **Delivery.**

3.1   *Packing and Shipment.* Tesla may specify the method of transportation and the type and number of packing slips and other documents to be provided with each shipment. Seller will pack and ship Products in accordance with Tesla's instructions, including labeling and hazardous materials instructions. If Tesla has not provided packing or shipping instructions, Seller will pack and ship Products in accordance with industry standards. If Seller is required to use Tesla's returnable packaging, Seller will be responsible for cleaning and maintaining such returnable packaging.

3.2   *Delivery Terms.* Seller will deliver Products in strict accordance with the Contract terms. Unless otherwise stated in the Contract, Products will be delivered FCA (Incoterms 2010) Seller's designated manufacturing facility and title will transfer upon delivery of the Products to Tesla in accordance with the agreed delivery terms.

3.3   *Time, Quantity and Quality are of the Essence.* TIME, QUANTITY AND QUALITY ARE OF THE ESSENCE AS TO ALL GOODS AND SERVICES. If Seller is late in delivery of any Goods or provision of Services, or if Seller cannot deliver the full quantities of Goods required under the Contract, or if Seller cannot meet the quality requirements under the Contract, Seller shall be in Default under the Contract. In addition to any other obligations to which Seller shall be subject to under the Contract, if Seller cannot meet the delivery dates, quantities or quality requirements specified in the Contract, Seller will promptly notify Tesla and the Authorized Purchaser and the Authorized Purchaser may, at its option: (a) cancel all or any portion of the Purchase Order or Release, as applicable, without liability to Seller; and/or (b) require Seller to deliver the Goods using priority freight delivery with incremental freight charges at Seller's expense; and/or (c) perform the Services using additional labor or have an alternative supplier perform the required Services that were to have been performed by Seller at Seller's expense. If neither the provisions in clause (a), (b) and (c) alone or together, is sufficient to meet such Authorized Purchaser's requirements, the Authorized Purchaser may purchase substitute goods and procure alternative services and hold Seller accountable for the difference between the price of the Goods or Services and the price paid by the Authorized Purchaser for substitute goods or services, if higher, including amounts charged for shipping, insurance, handling, and any taxes or duties. Authorized Purchasers may return over-shipments to Seller at Seller's expense. The provisions of this Section 3.3 are in addition to all of Seller's other obligations under the Contract and are in addition to all of Tesla's other rights and remedies provided at law, in equity and in the Contract.

## 4.   Payment.

4.1   *Price.* The purchase price: (a) is stated in the Purchase Order and, unless otherwise stated therein, is a firm fixed price for the duration of the Purchase Order and not subject to increase for any reason, including increased raw material costs, increased labor or other manufacturing costs, increased development costs, or changes in volumes or program length from those estimated or expected; (b) is inclusive of all taxes and any duties applicable to provision of the Products; and (c) is inclusive of all storage, handling, packaging, labeling, shipping and all other expenses and charges, and any charge for non-returnable packaging will be deducted from the purchase price if Tesla elects to use returnable packaging pursuant to Section 1.6(b) (Changes).

4.2   *Invoices.* Invoices will only be issued on or after delivery of the Products to the delivery location designated by the Authorized Purchaser and payment will be deemed to occur upon mailing of a check, wire transfer or commencement of other means of payment to Seller. All invoices will be issued in local currency, in strict compliance with the pricing in the Purchase Order. Seller will, at its expense, comply with Tesla's instructions and policies with respect to the form, content and method for submission of invoices.

4.3   *Payment Terms.* The Authorized Purchaser will pay invoices for Products that are properly delivered and not subject to dispute, sixty (60) days from the applicable invoice date. If the payment date is not a business day, payment will be due the next business day thereafter.

4.4   *Best Price.* Seller warrants that the prices for the Products are no less favorable than those that Seller then extends to any other customer for the same or similar Products purchasing similar quantities. If Seller reduces its prices to third Parties for the same or similar Products of similar purchase volumes, Seller will correspondingly reduce the prices charged to Tesla.

4.5   *Set Off.* In addition to any right of setoff or recoupment provided by law or in equity, Tesla will be entitled at any time to set off or recoup against sums payable by Tesla to Seller or any of Seller's Subsidiaries or affiliates any amounts for which Tesla determines in good faith Seller or any of Seller's Subsidiaries or affiliates is liable to Tesla. Tesla will consult with Seller prior to any such set off or recoupment.

4.6   *Payment Not Acceptance.* Payment for Products will not constitute acceptance of non-conforming Products, nor will it limit or affect any rights or remedies of Authorized Purchasers.

4.7   *Credits.* Credits or benefits resulting from the Contract, including trade credits, export credits or the refund of duties, taxes, or fees, belong to Tesla. Seller will provide all information and certificates (including NAFTA Certificates of Origin) necessary to permit Tesla to receive these benefits or credits.

4.8   *Taxes.* Unless otherwise stated in the Contract, the Contract price includes all applicable federal, state, provincial, and local taxes other than sales, value added, or similar turnover taxes or charges. The Products purchased from Seller are for resale which is exempt from all sales, use, value added or similar taxes. Seller will not charge sales, use, value added or similar taxes on its invoices to Tesla, provided that Tesla has provided Seller a valid resale certificate for Seller's records. If Seller is required by law to pay or collect from Tesla any taxes or charges, Seller will separately invoice Tesla for such taxes or charges subject to Section 4.7 (Credits). Each Party shall be responsible for any taxes on property it owns or leases, for franchise and privilege taxes on its business, for taxes based on its net income or gross receipts, and for employer-related taxes with respect to its personnel.

5. **Quality.**

5.1  (a)  Seller will perform all Services and provide all Goods in accordance with: (a) the requirements set forth in the Tesla Motors Supplier Handbook; (b) the most current Specifications; and (c) all of the following: supplier quality and development process program requirements, quality control and safety standards, and procedures and inspection systems, including:

(i)  GADSL, RoHS;

(ii)  California Transparency in Supply Chains Act of 2010 as it may be amended from time to time; and

(iii)  Section 1502 of the Dodd-Frank Wall Street Reform and Consumer Protection Act (commonly referred to as the conflict minerals provision) as it may be amended from time to time.

(b)  Seller understands and agrees that all Products will be used in or in conjunction with automotive products and Seller agrees to meet the full requirements of industry Production Part Approval Processes ("*PPAP*") for all Products.

(c)  Level 3 PPAP is required for all Products unless:

(i)  The parts supplied to the Authorized Purchaser are in production on another automotive vehicle platform and have a prior Level 3 PPAP (100% production tooled / 100% production

process).  In this case a copy of the part submission warrant is required and Tesla reserves the right to request further proof of documentation and/or data; or

(ii) The Products are interim or prototype.  In this case, and in lieu of a Level 3 submission, 100% inspection of all Products, material certifications for each Product, and a control plan is required in advance of every shipment to Tesla.  Failure to supply this information will result in the rejection of Seller's Products.

(d)  PPAP requirements apply to first shipments of new production parts.  If Seller has obtained PPAP approval from Tesla, no further PPAP submissions are necessary unless there is a:

(i) Design change (Tesla or Seller driven);

(ii) Production facility or tooling move;

(iii) Change of any supplier, design, manufacturing facility, Tooling (including tooling); and/or

(iv) Change of any manufacturing process.

(e)  If there is a conflict between any part of the above referenced programs, requirements or standards and an express provision of these General Terms, the provisions that require higher quality standards shall control.  To the extent any of the standards, policies or systems referenced above are amended, supplemented or replaced, Seller's obligations under the Contract will be automatically amended to conform to such amended standards, policies or systems and Seller will comply with such amended obligations, subject to the provisions set forth under Section 1.6.

5.2   *Inspections.*  Tesla or its designated third party may, upon reasonable advance notice and during normal business hours, inspect Seller's facilities and interview Seller's personnel to verify, validate and monitor compliance with Specifications and the Contract, including inspection of work in progress or completed prototype or production Goods, development and manufacturing processes, working conditions, and on-site living conditions, as applicable.  Seller will ensure that Seller's personnel who are knowledgeable of the relevant facilities attend such inspections.

## 6.   Representations and Warranties.

6.1   *Seller's Representations and Warranties.*

a)  <u>Products.</u>  Seller, on behalf of itself and suppliers to Seller, represents and warrants to Tesla and Tesla's respective successors and assigns that the Product(s) will:

(i)     be new (except to the extent Tesla agrees that any Software or Tooling shall not be new) and conform to the Contract in all respects (including the Specifications);

(ii)    be free and clear of any and all liens and encumbrances of any nature and that title to Products and Tesla Property will be vested in Tesla in accordance with the terms of the Contract;

(iii)   conform to all drawings, PPAP submissions (including certification data regarding the Products), samples and other descriptions furnished or relied upon by Tesla or otherwise part of the Contract;

(iv)    be fit for the purpose for which they are intended and safe for any use that is consistent with applicable Specifications;

(v)     conform with or operate according to applicable Specifications;

(vi)    be merchantable, free from all defects in design (except to the extent designed by Tesla without input from Seller), workmanship and materials and be of highest quality and workmanship;

(vii)   if developed for Tesla by Seller on its own or in conjunction with others, be selected, manufactured and assembled based upon Tesla's stated use and be fit and sufficient for the purposes intended by Tesla;

(viii)   conform to all applicable Laws of the United States, the European Union and its member states, and Japan (including without limitation, the National Traffic and Motor Vehicle Safety Act, United States motor vehicle safety standards and European Union Directive 2000/53/EC) and, subject to Section 1.6 (Changes) with respect to any required changes, Laws of additional countries specified by Tesla in writing; and

(ix)   not infringe any Intellectual Property Right of any third party, either on its own or in combination with any other goods, services or software.

b) <u>General</u>.  Seller represents and warrants that:

(i) Seller will perform all of its obligations under the Contract in a professional and workmanlike manner, consistent with industry standards and in accordance with all of the terms of the Contract;

(ii) Seller has the right and ability to enter into, perform the obligations under and agree to the covenants contained in the Contract;

(iii)   To the extent that Goods and Tooling will be transported into the United States, Seller represents and warrants that either:  (A) it is C-TPAT-certified by U.S. Customs & Border Protection, and will maintain that certification throughout the term of the Contract; or (B) it will comply with the C-TPAT (Customs-Trade Partnership Against Terrorism) security procedures that may be found on the customs website at www.cbp.gov <http://www.cbp.gov> (or such other website that the C-TPAT security procedures may be moved to by the U.S. Government).

c) <u>Performance</u>.  Seller represents and warrants that it will perform all Services: (i) in a good, professional and workmanlike manner, free from defects in material and workmanship and in accordance with industry standards; (ii) in accordance with the Contract and the applicable Work Order(s), if any; (iii) in compliance with all applicable Laws; (iv) efficiently and in a cost-effective manner subject to the requirements of the Contract; and (v) using qualified personnel with suitable training, education, experience and skill to perform the Services in accordance with timing and other requirements of the Contract.  Seller further represents and warrants that the Services will not infringe or misappropriate any Intellectual Property Rights of any third party.

d) <u>Debarment</u>.  For the full term of the Contract, Seller represents and warrants that it shall not:  (i) be debarred, suspended, excluded or disqualified from doing business with the United States Government; (ii) be listed on the Excluded Parties List System maintained by the General Services Administration of the United States Government (found at www.epls.gov); or (iii) be a Person with which U.S. Persons are prohibited from transacting business of the type contemplated by the Contract or with which U.S. Persons must limit their interactions to types approved by OFAC, such as by Law, executive order, trade embargo, economic sanction, or lists published by OFAC.  Seller agrees to immediately notify Tesla in writing in the event Seller breaches any of the preceding representations and warranties or has reason to believe that it will become in breach of any of the preceding representations and warranties.  Such breach of any representation or warranty under this Subsection shall be deemed a Default under the Contract for which Tesla may immediately terminate the Contract without being required to provide notice or permit Seller to cure such Default.

e) <u>Future Performance</u>.  All representations and warranties of Seller extend to future performance of the Products and are not modified, waived or discharged by delivery, inspection, tests, acceptance

or payment.  Tesla's approval of any design, drawing, material, process or specifications will not relieve Seller of these representations and warranties.

f) Warranty Period.  The warranty period for Products is forty-eight (48) months from the date on which the Products have been incorporated into a Tesla vehicle; provided, however, that such warranty period shall begin to run no later than six (6) months after delivery of the Products to Tesla despite such Products not having been incorporated into a Tesla vehicle.

g) Limited Warranties.  The warranties set forth herein are the exclusive warranties provided by Seller to Tesla.  All other warranties, whether express or implied by law or equity, are hereby disclaimed.

h) Application of Warranties.  Seller agrees that the warranties referenced herein extend to all Products notwithstanding the fact that such Products may be produced in whole or in part by any of Seller's own suppliers and, therefore, such warranties shall not be disclaimed or otherwise limited in any way due to the fact that any Products have been produced by one of Seller's own suppliers.

i) Notice.  Seller agrees to immediately notify Tesla in writing in the event Seller breaches or has reason to believe that it will breach of any of its representations or warranties under the Contract.

6.2   Rejection.  If an Authorized Purchaser rejects Products as defective or non-conforming, the quantities under the Purchase Order or Release will be reduced by the number of Products rejected by such Authorized Purchaser unless the Authorized Purchaser otherwise notifies Seller, and Seller will not replace reduced quantities without a new Purchase Order or Release from such Authorized Purchaser.  Following rejection, Seller will, without prejudice to any other right or remedy of Tesla, at Tesla's sole discretion and at Seller's sole expense:

- accept return of the Products at full invoice price, plus transportation charges; and/or
- provide replacement conforming Products within forty-eight (48) hours of receipt of a Purchase Order or Release for replacement parts; provided, however, that such replacement must be made within twenty-four (24) hours in the event Tesla's production is impaired due to the lack of such replacement parts; and/or
- Repair or retrofit (at any time prior to shipment from Tesla) Products so that they are non-defective and conform to the requirements of the Contract.

6.3   Corrective Action.  Promptly upon learning of defective or non-conforming Products, in addition to complying with the obligations set forth in Section 6.2 above, Seller will develop, document and implement corrective actions in accordance with all applicable quality control policies and standards of Tesla, including by: (a) promptly investigating and reporting on the root cause of the problem; (b) remedying the cause of the problem and resume performance in accordance with the Contract; (c) implementing and notifying Tesla of measures taken by Seller to prevent recurrences if the problem is otherwise likely to recur; and (d) making written recommendations to Tesla for improvements in procedures.  Seller will immediately notify Tesla in writing when it becomes aware of any ingredient, component, design or defect in the Products that is or may become harmful to persons or property or fails to meet the Specifications or other requirements of the Contract.

6.4   The provisions of this Section 6 are in addition to all of Seller's other obligations under the Contract and are in addition to all of Tesla's other rights and remedies provided at law, in equity and in the Contract.

7.   **Tesla Losses.**

7.1   Generally.  For any breach of the Agreement by Seller (such as Seller's failure to deliver conforming and non-defective Products or to comply with the shipping and delivery or other material requirements of Tesla), Seller shall only be liable to Tesla for direct damages caused by Seller's breach, incidental damages incurred by Tesla as a result of such breach, other damages that were

reasonably foreseeable at the time of the breach as a result of such breach, and costs and expenses incurred by Tesla in connection with the foregoing types of damages. This may include the following: (i) costs of containment, sorting, repair, replacement, cure, cover, or other costs incurred by Tesla; and (ii) costs of any recall campaign, corrective service action, or other voluntary or involuntary action in which Tesla or any Tesla customer participates to the extent related to the Products. In no event will Seller be liable for punitive, remote or speculative damages in connection with breach of the Agreement. Tesla will use commercially reasonable efforts to minimize the damages incurred in connection with any breach by Seller. In case of any claims by Tesla against Seller, Tesla will provide Seller with timely advance notice to give Seller the opportunity to avail itself of all available insurance coverage and other recourse. Tesla will provide to Seller all relevant data, information and parts for analysis and comprehensive documentation of amounts claimed.

7.2   *Seller's Liability for Warranty Costs and Expenses.* In the event any Products are determined to be defective during the warranty period, Seller shall be responsible for the payment or reimbursement of all labor and material costs (*"Warranty Costs and Expenses"*) reasonably required to (i) remove and replace defective Products from the total supply chain, (ii) rework defective Products, if applicable, and (iii) repair or replace defective Products in the field. In no event shall Seller's total Warranty Costs and Expenses per defective Product exceed two (2) times the then-current price for such Products under the Contract. Tesla will use commercially reasonable efforts to minimize the Warranty Costs and Expenses.

7.3   *Seller's Liability for Indirect and Consequential Damages.* Except as set forth in Section 7.4, in no event shall Seller's aggregate liability for indirect and consequential damages exceed $10 million USD per damage case maximum $50 million USD per year.

7.4   *Exclusions.* The liability cap set forth in Section 7.3 shall not apply to (i) Seller's indemnification obligations under Section 8, (ii) damages resulting from Seller's gross negligence or willful misconduct, or (iii) any costs or expenses for which Seller is liable under the Contract.

## 8.   Third-Party Claims.

8.1   *Indemnification.* Seller agrees to indemnify, defend and hold harmless, reimburse and compensate Tesla, its Authorized Purchasers, affiliates, distributors, agents, customers and users of the Tesla Products (or the products in which Tesla Products are incorporated) and all of such persons' and entities' respective agents, successors and assigns, and each of their shareholders, directors, officers, employers and agents, on demand, (collectively *"Indemnified Parties"*) from and against any and all costs, fees, penalties, expenses, damages (consequential and otherwise), attorneys' fees and all other liabilities whatsoever (*"Losses"*), arising out of any third party claim or allegation against any Indemnified Party which arises from or relates to any act or omission of Seller or any actual or alleged:

- noncompliance or breach of any representation, warranty or obligation under the Contract;
- recall campaign, service campaign, corrective action, or other voluntary or involuntary action or effort in which Tesla participates with respect to the Products or, to the extent caused by the Products, products into which the Products are incorporated;
- infringement (including claims of direct or contributory infringement or inducement to infringe) of any Intellectual Property Right relating to Products or any portion thereof, on its own or in combination with other goods or services;
- damages to property or personal injuries to the extent arising from or in connection with Seller's work on Tesla's premises or Seller's use of Tesla Property;
- challenge to Tesla's sole right, title and interest in Products or the Tesla Property, or right to possession of the Tesla Property brought by any third party, including toolmakers, subcontractors, and lending institutions, provided that Tesla has paid in full for such Products or Tesla Property; or
- claim by, on behalf of, or related to a Seller employee or agent.

8.2   *Tesla Participation.*  If Seller is obligated to indemnify under this Section 8, then Tesla may at its option, and at its sole cost and expense, participate in the defense of any claim with its own counsel.

8.3   *Limitations.*  To the maximum extent permitted by applicable law, Seller's obligation under this Section 8 will apply even if an Indemnified Party's conduct has contributed to the Losses, but Seller's indemnification will not apply to the extent that Losses were solely and directly caused by negligence or willful misconduct of such Indemnified Party.  Seller's obligation to defend and indemnify under this Section 8 will also apply regardless of whether the claim arises in tort, negligence, contract, warranty, strict liability or otherwise.

9.   **Compliance with Laws.**  In performing its obligations under the Contract, Seller will comply with all applicable laws, rules and regulations of the United States and any other countries where the Products are manufactured and the Services are performed including all applicable safety, employment, tax, export control and environmental laws and regulations.  The foregoing obligation includes, but is not limited to, all requirements of applicable Laws relating to money laundering, anti-terrorism, trade embargos and economic sanctions, now or hereafter in effect.  Seller will provide Tesla with accurate material safety data sheets regarding the Products and, upon Tesla's request, will provide Tesla with all other information reasonably required in order to comply with applicable laws.  In addition, Seller will comply with all applicable laws, rules, regulations, ordinances or other requirements of any national, state, local, or international body (collectively "*Laws*") relating to the manufacture, sale, delivery and use of the Products.  Upon request, Seller will submit to Tesla evidence of such compliance.

10.  **Intellectual Property Rights.**

10.1  *Ownership.*

a) If Seller, or any person employed by or working under the direction of Seller as a result of Seller's performance under the Contract conceives or first reduces to practice:  (a) any invention or any experimental, development or research activities, including engineering related thereto, whether or not patentable; (b) any reduction to practice of any subject matter, application or discovery which could be patented or copyrighted; or (c) any improvement in the design of the Products or any alternative or improved method of accomplishing the objectives of this Contract (collectively referred to herein as "**Inventions**"), such Inventions will be owned by a Party (as applicable, the "*Owner*") as follows: (i) by Tesla, if Tesla has paid for development costs relevant to the Invention; and (ii) by Seller, if Tesla has not paid for development costs relevant to the Invention.

b) Each Invention will be deemed confidential and proprietary property of the Owner, whether such Invention or any portions thereof can be copyrighted or patented or not.  To the extent that any Invention is not deemed to be owned by the Owner by operation of law (e.g., as a work made for hire), the other Party (the "*Non-Owner*") irrevocably assigns, transfers and conveys to the Owner, without further consideration, all of its right, title and interest (including all Intellectual Property Rights) in and to the Invention, subject only to such party's pre-existing intellectual property rights in the Invention (the "*Background IP*").  The Non-Owner will immediately disclose all Inventions to the Owner and, at no additional cost to the Owner, will cooperate (and cause its employees to cooperate) in executing any documents and taking any other actions necessary or convenient to patent, copyright, assign to the Owner or otherwise perfect or protect such Inventions for the benefit of the Owner.  As between the Parties, the Owner will be responsible for preparing, filing, and maintaining any and all applications, registrations, and renewals for Intellectual Property Rights with respect to an Invention and for prosecuting any such Intellectual Property Rights.

c) If an Invention is owned by Seller, Seller hereby grants to Tesla a non-exclusive, royalty-free, fully paid-up, perpetual, irrevocable, sub-licenseable, transferable, world-wide license to use the Invention as required to make, have made, repair, reconstruct, rebuild, relocate, use, sell and import goods or products which incorporate the Invention for itself and/or third-party end users.

10.2 *License to Tesla.* Seller hereby grants to Tesla, its Subsidiaries and affiliates, and their respective successors and assigns, and Tesla hereby accepts, a non-exclusive, irrevocable, royalty-free, fully paid up worldwide license, including the right to sublicense to others in connection with providing the Products to Tesla, under: (a) any Intellectual Property Rights owned or controlled by Seller or its affiliates, and relating to the Products, to make, have made, repair, reconstruct, rebuild, relocate, use, sell and import the Products, including Seller's Background IP in any Inventions; and (b) any works of authorship fixed in any tangible medium of expression (including drawings, prints, manuals and Specifications) furnished by Seller in the course of Seller's activity under the Contract, to reproduce, distribute and display such works and to prepare derivative works based thereon, subject to the other provisions of the Contract (all items in clauses (a) and (b) above, collectively, "**Seller's Intellectual Property**", and such license in respect thereof, the "**License**"). Seller acknowledges and understands that the License will be effective from the first date of delivery of the Products under the Contract and extend for so long as Tesla produces, maintains or repairs any Tesla Product that incorporates the Product. The License is intended to be subject to 11 USC Section 365(n), as an executory agreement under which Tesla has license rights to Seller's Intellectual Property, and is supplementary to any other rights of Tesla under the Contract and any other agreement with Seller.

10.3 *License to Seller.* Tesla hereby grants to Seller a limited, non-exclusive, non-assignable, non-sub licensable, license to use, copy, modify, make derivative works of, manufacture, import, and distribute any information or technology in which Tesla has any Intellectual Property Rights solely to the extent necessary for Seller to perform its obligations under the Contract. Seller agrees that it will not engage in, nor will it authorize or allow others to engage in, the reverse engineering, disassembly or the decompilation of any information or technology in which Tesla has any Intellectual Property Rights. Except as expressly provided in the Contract, no other rights or licenses are granted to Seller, including by way of implication, waiver or estoppel.

10.4 *Seller's Employees.* Seller will ensure that the terms of its contracts with its subcontractors and employees are consistent with the terms of this Section.

## 11. Property.

11.1 *Tesla Property.*

a) The tooling, jigs, dies, gauges, fixtures, molds, patterns, other equipment (collectively, the "**Tooling**"), as well as the supplies, materials, and other property used by Seller to manufacture, store, and transport Products, or used to provide Services to develop or make Products for Tesla (such Tooling, supplies, materials and other property shall collectively be referred to as the "**Property**") will be owned by Tesla if Tesla has provided or paid in full for the Property ("**Tesla Property**"). Seller will not purchase on the account of or charge Tesla for any Tesla Property except as authorized in a Purchase Order. Title to Tesla Property shall transfer to Tesla upon Tesla's payment in full for such Property.

Seller will assign to Tesla contract rights or claims in which Seller has an interest with respect to Tesla Property and execute bills of sale, financing statements, or other documents requested by Tesla or required to evidence Tesla's ownership of Tesla Property.

Seller will have no interest in Tesla Property paid for by Tesla except as an at-will bailee. To the extent permitted by law, Seller waives any lien or similar right it may have with respect to Tesla Property. Tesla is responsible for personal property taxes assessed against Tesla Property.

b) Operations and Maintenance. Seller will: (i) at its expense maintain all Tooling in good condition and repair, normal wear and tear excepted; (ii) furnish, maintain in good condition and replace when necessary Seller's Property needed to perform Seller's obligations under the Contract; (iii) use Tesla Property only for the manufacture, storage, and transport of Products for Tesla unless Tesla

otherwise approves in writing; (iv) at Tesla's request and expense, mark Tesla Property as belonging to Tesla; and (v) not remove Tesla Property from Seller's premises without Tesla's written approval. All replacement parts, additions, improvements, and accessories to Tesla Tooling will become part of Tesla Tooling.  Seller shall provide Tesla notice of unusual wear of Tesla Tooling and shall notify Tesla in advance of the Lead Time required to replace such Tesla Tooling, if the Tooling is likely to wear out prior to such Lead Time.  After the end of the Production Period, Seller agrees to maintain the Tooling as set forth in Section 2 and Tesla shall reimburse Seller's actual and reasonable, out-of-pocket expenses incurred for such maintenance.

c) <u>Payment</u>.  Tesla will pay for Tesla Property at the amount specified in the Contract.  The price for Tesla Property set forth in the Purchase Order will be adjusted to credit Tesla in the amount, if any, by which the price exceeds Seller's actual cost as verified.  Seller will retain all cost records for a period of five (5) years after receiving final payment of the charges.  Seller will provide to Tesla, as requested, access to Seller's premises and all documentation relating to the Tooling prior and subsequent to payment, to inspect work performed and to verify charges submitted by Seller against the Purchase Order.  Unless otherwise stated in the Contract, final payment for Tesla Property will be due at the time of the PPAP (Production Part Approval Process) approval date, per the agreed payment terms in Section 4.3 provided that Seller has provided complete documentation of Seller's expenses.

d) <u>Additional Responsibilities Regarding Tooling</u>.  If Seller is responsible for fabricating or acquiring Tooling, such Tooling will:  (i) comply with all Specifications; (ii) be capable of producing Products that conform to the terms of the Contract, including meeting any volume requirements or estimates provided to Seller during the life of the Product as well as satisfying the requirements for service parts; (iii) if Tesla Property, be clearly and permanently marked as Tesla property according to Tesla's direction.  Seller will provide progress reports upon Tesla's request and will promptly notify Tesla in writing if it believes that the Tooling might not be completed by the completion date specified on the Purchase Order.  The foregoing is in addition to Seller's other obligations and Authorized Purchasers' other rights and remedies at law, in equity and in the Contract.

e) <u>Tesla's Rights of Possession, Equitable Relief</u>.  Tesla has the right to the sole, unencumbered, unqualified, and absolute possession of Tesla Property at any time as elected by Tesla and Seller will immediately release to Tesla upon request, and Tesla may retake immediate possession of Tesla Property at any time with or without cause and without payment of any kind unless otherwise provided in the Contract.  Seller will release the requested Tesla Property to Tesla F.O.B. Seller's facility (Incoterms 2000), properly packed and marked in accordance with the requirements of Tesla's carrier.  Seller hereby grants to Tesla an unconditional right of entry to inspect and remove Tesla Property from the premises where Tesla Property is located without liability in trespass for such entry.  Any failure or threatened failure by Seller to perform its obligations under this Section 11 for any reason whatsoever shall entitle Tesla, in addition to any other remedy to which Tesla may be entitled, to institute and prosecute proceedings in a court of competent jurisdiction to obtain temporary and/or permanent injunctive or other equitable relief to enforce any provision hereof without the necessity of posting bond or proof of action, injury or damage.  The foregoing is in addition to Seller's other obligations and Authorized Purchasers' other rights and remedies at law, in equity and in the Contract.

f) <u>Waiver of Liens</u>.  As a continuing condition of Seller's possession or use of Tesla Property, Seller shall ensure that no third party obtains any lien or other right in Tesla Property and hereby waives and relinquishes, and agrees to obtain from any third parties who might claim any such lien (including without limitation mechanic's liens) or right, their written waiver and relinquishment of all rights, if any, to any lien or other right of retention whatsoever with respect to Tesla Property. To the extent that any common law or statutory provision should be deemed applicable to Tesla

Property and should confer upon or create in favor of Seller any lien, right, or remedy, whether for work performed on or goods produced with or raw materials ordered in connection with Tesla Property, Seller hereby irrevocably waives and relinquishes, for itself and its successors and assigns, any and all such liens, rights, and remedies, agreeing that its rights and remedies are solely as set forth in these General Terms.  The provisions of this Section 11 are a bargained consideration essential to Tesla's agreement and to Seller's possession of Tesla Property.

## 12.  Duration and Termination of the Contract.

12.1  *Duration.*  The Contract will come into effect as set forth in Section 1.4 and shall remain in effect until terminated under this Section 12 or by mutual written agreement of the Parties.

12.2  *Termination.*  The Party who is not in Default may terminate the Contract:  (a) immediately upon notice ("*Notice of Termination*") in the event of an incurable Default or in the event of a Default under Subsections 12.3(b), (e), (f), or (g); or (b) thirty (30) days following Notice of Termination if the defaulting Party fails to cure a Default under Subsections 12.3(a), (c), (d) or (h) within such 30-day period; or (c) immediately without Notice of Termination if Seller is in violation of the Debarment provisions in Subsection 6.1(c).  Neither Party may terminate or cancel the Contract for any reason except as provided in this Section 12.

12.3  *Events of Default.*  Subject to Section 15, either Tesla or Seller will be in "*Default*" under the Contract if it:  (a) fails to perform or breaches any obligation under the Contract; (b) repudiates or threatens to breach any of the terms of the Contract; (c) fails to deliver, or threatens not to deliver, Products in connection with the Contract; (d) fails to meet reasonable quality requirements so as to endanger timely and proper performance of the Contract; (e) makes an assignment for the benefit of creditors in violation of the Contract, or proceedings in bankruptcy or insolvency are instituted by or against it; or (f) becomes a debtor in a bankruptcy, insolvency, receivership, or similar proceeding commenced by a third party that is not dismissed within thirty (30) days after commencement.  In addition, Seller will be in Default if:  (g) Seller fails to provide adequate assurance of performance under the Contract within three (3) business days after written demand by Tesla; or (h) at any time in Tesla's reasonable judgment that Seller's financial or other condition or progress on the Contract will be such as to endanger timely performance.

12.4  *Obligations Following Termination.*  Following Notice of Termination:

a)  And only upon termination for Tesla's Default, Tesla will pay to Seller the following amounts, without duplication, in complete and final satisfaction of any and all liabilities relating to the Contract:

   i)  The purchase price for all conforming Products received by Tesla prior to Notice of Termination or delivered following Notice of Termination pursuant to this Subsection 12.4;

   ii)  Any amounts owed for Transition Support;

   iii)  Raw materials and components (if any) that were purchased in order to meet the requirements of the first four (4) weeks of the relevant Release and such materials and components that: (A) meet all of the relevant Specifications; (B) were ordered no earlier than applicable Lead Times of the materials and components in order to meet the delivery dates specified in the Release; and (C) cannot be returned for a refund or credit or used for or sold to any of Seller's other customers.

   iv)  Any amounts owed according to the agreed Production Pricing Agreement.

b)  Seller will:

i)   immediately terminate all work under the Contract;

ii)  transfer title and deliver to Tesla all finished work completed prior to receipt of the Notice of Termination, provided that Tesla has paid in full for all such finished work;

iii) if and to the extent requested by Tesla, transfer title and deliver to Tesla all work in process, and the parts and materials which Seller produced or acquired in accordance with the Contract, provided that Tesla has paid in full for all such work in process, parts and materials;

iv)  verify and settle all claims by subcontractors for actual costs that are rendered unrecoverable by such termination, provided Seller has taken possession or is certain it will take possession of the materials for which Seller has settled such claims;

v)   take actions reasonably necessary to protect property in Seller's possession in which Tesla has an interest (including Tesla Property) until disposal instructions from Tesla have been received;

vi)  if requested by Tesla, Seller shall provide all reasonable assistance to enable Tesla to transition supply to a successor supplier, including the following, which will collectively be referred to as *"Transition Support"*, the period of which shall not exceed four (4) weeks following Supplier's receipt of any Notice of Termination:

A.   Seller will continue production and delivery of all Products as ordered by Tesla, at the prices and other terms stated in the Contract, without premium or other condition; and

B.   subject to Seller's actual capacity constraints, Seller will provide special overtime production, storage and/or management of extra inventory of Goods, extraordinary packaging and transportation and other special services as expressly requested by Tesla in writing.

Tesla will, at the end of the transition period, pay the reasonable, actual cost of Transition Support, provided that Seller has advised Tesla prior to incurring such amounts of its estimate of such costs.  If the Parties disagree on the cost of Transition Support, the Parties shall utilize the dispute resolution provisions set forth in Section 19.

vii) Grant to Tesla all rights to the Property in accordance with Section 11.1(e).

12.5   *Tesla and other Property.*  If Seller does not release or deliver Tesla, Tesla may, at Seller's cost and expense:  (a) obtain an immediate court order for possession without notice and without posting a bond; and (b) enter Seller's premises, with or without legal process, and take immediate possession of Tesla Property.  To the extent permitted by law, Seller waives any right to object to Tesla's repossession of Tesla Property in a bankruptcy or other proceeding.

## 13. Confidential Information.

13.1   The Parties agree that trade secrets, specifications, drawings, notes, instructions, engineering data and analyses, compositions of matter, financial data, and other technical and business data which are supplied or disclosed by Tesla or Seller in connection with the Contract, in each case that are marked or otherwise identified as confidential or where their confidential nature is apparent at the time of disclosure (*"Confidential Information"*), will be deemed confidential and proprietary to, and remain the sole property of, the disclosing party.

13.2   *Non-use and Non-disclosure Requirements.*  Subject to Subsection 13.3 of these General Terms, the receiving party agrees not to:  (a) use disclosing party's Confidential Information for any reason,

other than for purposes of performing the Party's obligations or exercising its rights under the Contract; and (b) disclose the disclosing party's Confidential Information to any third party except its employees, consultants, and directors, who have a "need to know" such Confidential Information to further the purposes of the Contract. The receiving party shall exercise the same degree of care in protecting disclosing party's Confidential Information that it uses for its own confidential information of a similar nature, but in no event less than reasonable care. In addition to all of the receiving party's other obligations to the disclosing party, the receiving party will immediately notify the disclosing party upon discovery of any loss or unauthorized disclosure of the Confidential Information of the disclosing party. The receiving party shall be responsible for any unauthorized use or disclosure of Confidential Information by any of its employees, consultants, or directors. In addition, Seller shall not disclose, distribute, or otherwise make available the Goods, in whole or parts thereof, or any information related thereto (including, without limitation, specifications, designs, drawings, mechanical/electrical implementation, schematics, photographs, testing procedures) to any third party except to the extent necessary for Seller to fulfill its obligations under the Contract. This shall not apply for Seller's standard components which are already publicly known.

13.3 *Exceptions.* Confidential Information will not include information that: (a) is or becomes generally available to the public other than as a result of a violation of this Section 13 by the receiving party; (b) was obtained by the receiving party on a non-confidential basis from a third party who had the right to disclose it; or (c) is legally required to be disclosed. Tesla and Seller will each use the same degree of care to safeguard Confidential Information that it uses to protect its own confidential information from unauthorized access or disclosure (but not less than a reasonable degree of care). Upon request by the disclosing party, the receiving party will promptly return or destroy the original and all copies of Confidential Information received. A disclosure of Confidential Information that is required to be made by the receiving party pursuant to any request, order or requirement of a court, administrative agency or any other governmental agency shall not be deemed a breach of this Agreement, provided that the receiving party has: (x) immediately notified the disclosing party in writing of such, request, order or requirement; (y) given the disclosing party an opportunity to contest disclosure or seek an appropriate protective order; and (z) cooperated with disclosing party to narrow the scope of such disclosure to only that portion of the Confidential Information that is necessary to fulfill the request, order or requirement.

13.4 *Conflicts.* If there is a conflict between any part of this Section 13 and a non-disclosure agreement executed by the Parties, the term(s) that are more protective of Tesla's Confidential Information shall control and govern.

14. **Assignment and Subcontracting.** The Contract is issued to the Seller, in reliance upon its personal performance of the duties imposed. Without prior written consent of Tesla, Seller may not assign the Contract or subcontract or delegate the performance of its duties hereunder, and any attempt to do so shall be void. Tesla shall not unreasonably withhold, condition or delay its consent to use of a Seller Affiliate for particular aspects of Seller's performance hereunder.

If Seller intends that all or part of the fabrication, modification, repair or refurbishment of Tooling that is Tesla Property (e.g. tooling) or manufacture of Products will be subcontracted to a third-party subcontractor, the Seller will: (a) give Tesla advance written notice of the identity of the subcontractor and the proposed location of Tesla Property and obtain Tesla's prior written permission; (b) inform the subcontractor in writing that it is a bailee-at-will, through the Seller, of Tooling owned by Tesla; (c) be solely responsible for payments to the subcontractor; and (d) include in its purchase order for Tooling or Products, a waiver of subcontractor liens. Tesla has no obligation to Seller or subcontractor other than payment to Seller of the price in Tesla's purchase order.

Seller will ensure that the terms of its contracts with its sub-suppliers and sub-contractors provide Tesla with all of the rights specified in the Contract. Any subcontracting, assignment or delegation does not relieve Seller of any responsibility under this Contract. In addition, without requiring Seller's consent or meeting any other condition, Tesla is permitted to collaterally assign and grant a security interest in any or all of its rights, benefits or remedies under the Contract Documents to (a) a Subsidiary, or (b) any or all of its lenders and other creditors (including the United States Department of Energy or any agent acting for its benefit and the benefit of other secured parties) pursuant to the terms of any applicable security agreements entered into by Tesla in favor of such lenders or creditors and, in connection with exercising their rights and remedies under such security agreements, such lenders or other creditors may cause Tesla's rights, benefits or remedies under the Contract Documents to be transferred and assigned outright to themselves or to any third party; provided, however, that the applicable transferees or assignees under this clause assume all of Tesla's obligations under the Contract.

15. **Excusable Non-Performance**. A delay or failure by either Party to perform its obligations under the Contract will be excused, and will not constitute a Default, only if: (a) caused by an act of God or war; (b) the non-performing Party is without fault in causing or failing to prevent such act or event; (c) the event cannot be circumvented through the use of commercially reasonable alternative sources, workaround plans or other means; and (d) the affected Party unable to perform gives notice of the act or event (including its anticipated duration) to the other Party promptly after becoming aware that it has occurred or will occur, and of its plans and efforts to implement a work-around. The affected Party will continue to use commercially reasonable efforts to perform to the extent possible, and will notify the other Party promptly when the act or event has abated. If Seller is unable to perform for any reason, Tesla may purchase Products from other sources and reduce its purchases from Seller accordingly without liability to Seller. Within three (3) business days after written request by the other Party, the non-performing Party will provide adequate assurances that the non-performance will be cured within a reasonable period of time not to exceed 30 days unless the nature or extent of the event or occurrence reasonably justifies an extension in which case the non-performing Party shall so notify the other of such non-performing Party's estimated date of performance. If the non-performing Party does not provide those assurances or if the non-performance exceeds thirty (30) consecutive days or a period reasonably justified by the nature or extent of the act or event, the other Party may terminate the Contract by notice given to the non-performing Party before performance resumes.

16. **Labor Contracts**. Seller will notify Tesla of any labor contract expiration date at least six (6) months before the expiration of a current labor contract that has not been extended or replaced. Tesla may thereafter direct Seller in writing to manufacture up to thirty (30) days of additional inventory of Products, specifying the quantities of Products required and any packaging and storage requirements. Seller will use commercially reasonable efforts to comply with Tesla's written directions prior to expiration of the current labor contract and until the current labor contract has been extended or a new contract completed. By authorizing the additional inventory, Tesla commits to buy the entire quantity of conforming Products requested and produced. Seller is responsible for carrying costs and any additional costs of manufacture.

17. **Customs**. As specified in Section 4.7, transferable credits or benefits associated with Products purchased, including trade credits, export credits, or rights to the refund of duties, taxes, or fees, belong to Tesla unless otherwise prohibited by applicable law. Seller will provide Tesla with all information and records relating to the Products necessary for Tesla to: (a) receive these benefits, credits and rights; (b) fulfill any customs obligations, origin marking or labeling requirements, and certification or local content reporting requirements; (c) claim preferential duty treatment under applicable trade preference regimes; and (d) participate in any duty deferral or free trade zone programs of the country of import. Seller will obtain all export licenses and authorizations and pay all export taxes, duties, and fees unless otherwise stated in the Contract, in which case Seller will provide all information and records necessary to enable Tesla to obtain those export licenses or authorizations.

**18. Insurance.** At all times throughout the term of the Contract, Seller shall procure and maintain, at its sole cost and expense, and upon request furnish to Tesla a certificate evidencing the following insurance:

    a) A policy or policies of commercial general liability insurance with minimum coverage of at least One Million Dollars ($1,000,000) combined single limit per occurrence for bodily injury and/or property damage, as well as contractual liability coverage and naming Tesla as an additional insured.

    b) A policy or policies of employer's liability insurance with minimum coverage of at least One Million Dollars ($1,000,000). Seller shall also comply with all applicable workers' compensation and/or other laws that may accrue in favor of any Seller personnel in all locales where Seller personnel perform(s) hereunder.

    c) A policy or policies of automobile liability insurance on all owned, non-owned and/or hired vehicles with minimum coverage of at least One Million Dollars ($1,000,000) combined single limit per occurrence for bodily injury and/or property damage, and physical damage insurance for the actual cash value of each such vehicle.

    d) All risk property perils insurance covering the full replacement value of Tesla Property while in Seller's care, custody, or control and naming Tesla as loss payee.

**19. Dispute Resolution.**

    *19.1 Negotiation and Mediation.* Tesla and Seller will first endeavor to resolve through good faith negotiations any dispute arising under the Contract. If a dispute cannot be resolved through good faith negotiations within a reasonable time, either Party may request non-binding mediation by a mediator approved by both Parties (or absent that approval, by the National Center for Dispute Resolution), to be conducted in San Francisco, California. Each Party must bear its own expenses in connection with the mediation and must share equally the fees and expenses of the mediator.

    *19.2 Litigation.* If the Parties are unable to resolve the dispute within sixty (60) days after commencing mediation, either Party may commence litigation in the state court in Santa Clara County, California or in the federal courts of the Northern District of California. The Parties irrevocably submit to the exclusive jurisdiction of those courts and agree that final judgment in any action or proceeding brought in such courts will be conclusive and may be enforced in any other jurisdiction by suit on the judgment (a certified copy of which will be conclusive evidence of the judgment) or in any other manner provided by law. Process served personally or by registered or certified mail, return receipt requested, will constitute adequate service of process in any such action, suit or proceeding. Each Party irrevocably waives to the fullest extent permitted by applicable law: (a) any objection it may have to the venue in any court referred to above; (b) any claim that any such action or proceeding has been brought in an inconvenient forum; and (c) any immunity that it or its assets may have from any suit, execution, attachment (whether provisional or final, in aid of execution, before judgment or otherwise) or other legal process.

**20. Tesla Limitation of Liability.** In no event will Tesla be liable for anticipated profits, interest, penalties or incidental, consequential, punitive, multiple, or exemplary damages or liabilities in connection with the Contract, whether for breach of contract, late payment, property damage, personal injury, illness, or death or otherwise. In addition and without limiting any of the foregoing, Tesla will have no obligation for and will not be required to pay Seller, directly or on account of claims by Seller's subcontractors, for loss of anticipated profit, failure to realize anticipated production volumes, revenues or savings, unabsorbed overhead, interest on claims, product development and engineering costs, tooling, facilities and equipment rearrangement costs or rental, unamortized capital or depreciation costs, or general administrative burden charges from termination of the Contract. In addition to the foregoing, Tesla shall have no liability for any act, omission or obligation of any Authorized Purchaser except to pay the amounts required under Section 1.5 for Production POs or Releases that were issued by an Authorized

Purchaser within Tesla's schedule and forecast, and subject to the limitations and exclusions set forth in the Contract and these General Terms. Any payment or delivery terms agreed to by Seller and Authorized Purchaser shall be superseded by the payment and delivery terms set forth in these General Terms.

**21. Miscellaneous.**

21.1 *Survival.* The expiration or termination of the Contract shall not affect Seller's obligations or representations and warranties and Tesla's rights under the Contract with respect to Products delivered or ordered prior to such expiration or termination, or Products ordered pursuant to Subsection 12.4 above. Without limiting the foregoing, Sections 1.1, 1.2(b), 1.3(a), 1.4, 1.5, 1.6(a), 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21 and 22 shall survive termination or expiration of the Contract and these General Terms.

21.2 *Advertising and Publicity.* During and after the term of the Contract, Seller will not advertise or otherwise disclose its relationship with Tesla without Tesla's prior written consent, except as may be required to perform the Contract or as required by law. Neither Party shall have any right or license to use the trademarks, service marks or logos of the other Party for any purpose without first obtaining written consent of the other Party from an authorized representative thereof.

21.3 *Seller's Conduct.* Tesla is committed to ensure that working conditions in Tesla's supply chain are safe and humane, that workers are treated with respect and dignity, and that manufacturing processes are environmentally responsible. Accordingly, Seller agrees to comply with all of Tesla's seller conduct requirements that Tesla may provide and amend from time to time, and further agrees that Seller shall: (a) not request or encourage, directly or indirectly, any Seller personnel to furnish false or incomplete information in connection with the audit and inspection; (b) take retaliatory action against any Seller personnel interviewed; and (c) immediately implement corrective action to remedy any non-conformance with Tesla's seller conduct requirements. Tesla reserves the right to disclose or have an Authorized Purchaser or third party disclose publicly on an aggregated basis, the results of any audit and inspection regarding Seller's treatment of its workers, including any non-conformance with Tesla's seller conduct requirements. Seller's failure to remedy any non-conformance with Tesla's seller conduct requirements after a reasonable amount of time will be deemed to be a Default.

21.4 *Environmentally Friendly Practices.* In addition to complying with all environmental and safety requirements, to the maximum extent practicable, Seller will use environmentally conscious materials and practices in the development, manufacturing, packaging and delivery of all Products.

21.5 *Audit and Inspection Rights.* Tesla and its authorized representatives shall have the right from time to time to access Seller's premises and verify: (a) Seller's compliance with the terms of the Contract; and (b) Seller's performance or ability to perform under the Contract. Seller will maintain records as necessary to demonstrate Seller's compliance with the terms of the Contract, including showing that amounts charged to Tesla are true and correct. Tesla and its representatives may audit Seller's records made within five (5) years prior to the audit date (including of transactions completed), to the extent needed to verify compliance with the Contract, including verifying that quantities shipped and the prices charged match the Contract prices. Any audit will be conducted at Tesla's expense (but will be reimbursed by Seller if the audit uncovers errors in the amounts charged in excess of 5% or other Seller breaches that expose Tesla to potential liability).

21.6 *Electronic Communication.* Seller will comply with the method of electronic communication specified by Tesla in Tesla's request for quotation and confirmed in the Contract, including requirements for electronic funds transfer, purchase order transmission, electronic signature, and communication. Seller will also comply with any modification to Tesla's specified method of electronic communication after the date of the Contract.

21.7 *Relationship of the Parties.* The Parties are independent contractors under the Contract and no other relationship is intended, including, without limitation, a partnership, franchise, joint venture, agency, employer/employee, fiduciary, master/servant relationship, or other special relationship. Neither Party shall act in a manner that expresses or implies a relationship other than that of independent contractor, nor bind the other Party.

21.8 *Independent Efforts and Similar Goods.* Provided there is no infringement of either Party's Intellectual Property Rights nothing in these General Terms will impair either Party's right to develop, manufacture, purchase, use, sell or market, directly or indirectly, alone or with others, products or services competitive with those offered by Seller.

21.9 *Waiver.* The failure of either Party to enforce on a particular occasion any right or remedy provided in the Contract or by law or in equity will not be deemed a waiver of that right or remedy on a subsequent occasion or a waiver of any other right or remedy.

21.10 *Entire Agreement.* The Contract constitutes the entire agreement between the Parties with respect to its subject matter, and supersedes all prior oral or written representations or agreements by the Parties with respect to the subject matter of the Contract. Except as authorized in Subsection 1.6, no subsequent terms, conditions, understandings, or agreements purporting to modify the terms of the Contract will be binding unless in writing and signed by both Parties.

21.11 *Severability.* If for any reason a court of competent jurisdiction finds any provision of the Contract to be unenforceable, that provision of the Contract will be enforced to the maximum extent permissible so as to implement the intent of the Parties, and the remainder of the Contract will continue in full force and effect.

21.12 *Interpretation.* When used in these General Terms, "including" means "including without limitation" and terms defined in the singular include the plural and vice versa. The words "will" and "shall" shall be understood to apply to a mandatory obligation, not a permissive statement. The Contract, including any exhibits and Contract Documents hereto, shall be construed without the aid of any canon or rule of law requiring interpretation against the Party drafting or causing the drafting of an agreement or the portions of an agreement in question, it being agreed that all Parties hereto have participated in the preparation of the Contract.

21.13 *Precedence.* In the event of a conflict in the Contract Documents, the order of precedence will be: (a) any written agreement signed by authorized representatives of both Parties expressly amending a Contract Document; (b) the applicable Production PO or Discrete PO; (c) a pricing agreement signed by both Parties; (d) any Product-specific exhibits or attachments to these General Terms; (e) these General Terms and any exhibits, attachments, schedules and documents included or referenced in these General Terms that are not Product-specific attachments or schedules; and (f) any other Contract Document. These General Terms shall supersede any standard terms and conditions that are automatically attached to purchase orders issued by Tesla.

21.14 *Notices.* Any notice or other communication required or permitted in the Contract must be in writing and will be effective on the date of actual receipt if the date of actual receipt is a business day or on the next business day if the date of actual receipt is not a business day.

21.15 *Governing Law; Venue.* Unless otherwise agreed in writing, the Contract will be governed by and interpreted according to the internal laws of California. The UN Convention on Contracts for the International Sale of Goods will not apply to the Contract. The state courts of California and federal courts sitting in the Northern District of California have exclusive jurisdiction to determine any dispute arising under or relating to these General Terms. The Parties acknowledge and agree that any breach or threatened breach of the disclosing party's Confidential Information or Intellectual Property Rights could cause harm to the disclosing party for which money damages may not provide

an adequate remedy.  The Parties agree that in the event of such a breach or threatened breach, in addition to any other available remedies, the disclosing party may seek temporary and permanent injunctive relief restraining the receiving party from disclosing or using, in whole or in part, any Confidential Information or breaching the disclosing party's Intellectual Property Rights, provided it does so in accordance with these General Terms, including this Section 21.15.  The Parties hereby waive any bond requirements for obtaining equitable relief.

21.16 *Counterparts.*   These General Terms may be executed in counterparts, each of which shall be an original and together which shall constitute one and the same instrument.

21.17 *No Third Party Beneficiaries.*   Unless otherwise expressly provided for herein, no provisions of the Contract are intended or shall be construed to confer upon or give to any person or entity other than Seller, Tesla (and their authorized assignees under Section 14) or any Authorized Purchaser any rights, remedies or other benefits under or by reason of the Contract.

## 22. Definitions.

"*Acceptance*" has the meaning set forth in Subsection 1.3.

"*Anti-Money Laundering Laws*" shall mean all applicable laws, regulations and sanctions, state and federal, criminal and civil, that: (a) limit the use of and/or seek the forfeiture of proceeds from illegal transactions; (b) limit commercial transactions with designated countries or individuals believed to be terrorists, narcotics dealers or otherwise engaged in activities contrary to the interests of the United States; (c) require identification and documentation of the parties with whom a Financial Institution conducts business; or (d) are designed to disrupt the flow of funds to terrorist organizations. Such laws, regulations and sanctions shall be deemed to include, without limitation, the USA PATRIOT Act of 2001, Pub. L. No. 107-56 (the "*Patriot Act*"), the Bank Secrecy Act of 1970, as amended, 31 U.S.C. Section 5311 et seq., the Trading with the Enemy Act, 50 U.S.C. App. Section 1 et seq., the International Emergency Economic Powers Act, 50 U.S.C. Section 1701 et seq., and the sanction regulations promulgated pursuant thereto by the OFAC, as well as laws relating to prevention and detection of money laundering in 18 U.S.C. Sections 1956 and 1957.

"*Authorized Purchaser*" means (i) Tesla, (ii) a Tesla Subsidiary, or (iii) any other entity that is authorized in writing by Tesla to purchase Goods or Services on behalf of Tesla and approved in writing by Seller, and Seller shall not unreasonably withhold, condition or delay any such approval.

"*Contract Documents*" means these General Terms, the Production PO or Discrete PO (as applicable), documents and attachments referenced in any of the foregoing (including Specifications and Releases), purchase pricing agreements, statements of work, and any other additional written agreements provided that such they are signed by authorized representatives of both Parties and pertain to the Products.

"*Default*" has the meaning set forth in Subsections 6.1(c) and 12.3.

"*Discrete PO*" has the meaning set forth in Subsection 1.2.

"*Effective Date*" has the meaning set forth in introduction.

"*Embargoed Person*" means any person, entity or government subject to trade restrictions under U.S. law, including but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder with the result that the investment in Tenant is prohibited by law or Tenant is in violation of law.

"*General Terms*" means these General Terms and Conditions for Prototype or Production Parts or Services and all exhibits, schedules or attachments hereto, and any documents, requirements, or Specifications referenced herein or therein.

*"Goods"* means all products identified in a statement of work or product specific attachment or amendment to these General Terms, and all products that are not so identified, but which are offered or sold by Seller to Tesla or any of its Authorized Purchasers. Goods shall include goods made by or on behalf of Seller and sold by Seller to any Authorized Purchaser, directly or indirectly including through resellers, distributors, value-added distributors and subassembly manufacturers. Goods includes prototype and development parts, pre-production versions of Goods, Tesla Property and Software. To the extent that the Goods are Software, references to "sale" or words of similar meaning shall be deemed to refer to a "license" of such Goods consistent with the terms in the Contract.

*"Intellectual Property Rights"* means any right arising under U.S. or foreign law relating to patent, trademark, mask work, copyright, moral, industrial design right, or trade secret right or any other proprietary rights similar to the aforementioned rights and protected under foreign law.

*"Lead Time"* means the minimum time expressly agreed upon in a written agreement signed by both Parties that an order should be placed so that the supplier of the good or service may deliver by the desired delivery date, or if not so agreed, the shortest amount of time required by a typical supplier in the relevant industry, to manufacture the goods or complete the services that are the subject of the order.

*"Person"* means an individual, corporation, partnership, limited partnership, joint venture, association, joint stock company, trust, trustee, estate, limited liability company, unincorporated organization, real estate investment trust, government or any agency or political subdivision thereof, or any other form of entity.

*"Production Period"* means the period during which Tesla uses the Goods in production of Tesla Products.

*"Production PO"* has the meaning set forth in Subsection 1.2. Volumes set forth in Production POs are not binding on any Authorized Purchaser and are provided for Seller's planning purposes only.

*"Products"* means Goods or Services or both Goods and Services.

*"Property"* has the meaning set forth in Subsection 11.1(a).

*"Purchase Order"* means a Production PO or Discrete PO.

*"Purchase Orders"* may mean multiple Production POs, multiple Discrete POs, or a combination of the two types of purchase orders.

*"Release"* means a written communication issued by Tesla or an Authorized Purchaser that identifies a specific quantity of Goods and associated delivery date by which Seller shall deliver such Goods.

*"Seller"* means Seller and/or Seller's Affiliate.

*"Seller Affiliate"* means any entity authorized by Tesla to provide Products under these General Terms.

*"Seller Personnel"* means any personnel furnished by Seller to perform its obligations under the Contract, including employees and independent contractors of Seller, its Subsidiaries and subcontractors.

*"Seller's Property"* means all Property that is not Tesla Property.

*"Service Period"* has the meaning set forth in Subsection 2.2.

*"Services"* means services offered by Seller related to the development and/or production of Tesla Products.

*"Software"* means software provided for use in development, testing or production of Goods, and includes firmware.

*"Source Code"* means the human readable form of Software.

"*Specifications*" means the most current version of all applicable specifications and requirements either: (i) provided by Tesla, including other documents or requirements specifically incorporated or referenced in these General Terms, Purchase Orders, bills of materials, statements of work, project schedules, drawings, and CAD data; or (ii) any samples, drawing, CAD data, spec sheets, or other descriptions or specifications or representations provided by Seller that are approved of by Tesla or relied upon by Tesla.

"*Subsidiary*" means with respect to any Party, any entity that is directly or indirectly controlling, controlled by, or under common control with such Party. For purposes of this definition, "control" when used with respect to any entity means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such entity, whether through the ownership of at least fifty percent (50%) of voting securities, by contract or otherwise; the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"*Tesla*" means Tesla Motors, Inc. and/or a Subsidiary(ies) of Tesla.

"*Tesla Tooling*" means Tooling that is Tesla Property.

"*Tesla Motors Supplier Handbook*" means the most current version of the written set of guidelines, standards and requirements provided by Tesla regarding development and production of Products under these General Terms. The Tesla Motors Supplier Handbook may be provided by Tesla electronically or via a web-based portal.

"*Tesla Product*" means any product that is manufactured by or on behalf of Tesla. Tesla Products may include vehicles, chargers, subassemblies, systems and components.

"*Tesla Property*" has the meaning set forth in Subsection 11.1(a).

"*Tooling*" has the meaning set forth in Subsection 11.1(a).

"*Transition Support*" has the meaning set forth in Subsection 12.4(e).

"*U.S. Person*" means a United States citizen, entity organized under the laws of the United States or its territories or entity having its principal place of business within the United States or any of its territories.

"*Work Order*" means the form of document that will be used to authorize Seller to perform Services by mutual agreement of the Parties, which has been duly executed by the authorized representatives of both Parties.

**IN WITNESS WHEREOF**, the Parties have executed these General Terms by persons duly authorized below:

**SELLER:**                                    **TESLA MOTORS, INC.:**

_____          _____
(SIGNATURE)                                (SIGNATURE)


Daniel Braun                               Peter Carlsson
Name                                       Name


Senior Vice President, Managing Director    Vice President, Supply Chain
Title                                      Title

**Exhibit 1 – OFAC Compliance**

Seller represents and warrants as follows:

1.      Seller is not now and has never been nor shall it be at any time prior to the mutual execution and delivery of the Contract a Person with whom a U.S. Person is prohibited from transacting business of the type contemplated by the Contract, whether such prohibition arises under United States law, regulation, executive orders and lists published by the Office of Foreign Assets Control, Department of the Treasury ("**OFAC**") (including those executive orders and lists published by OFAC with respect to Persons that have been designated by executive order or by the sanction regulations of OFAC as Persons with whom U.S. Persons may not transact business or must limit their interactions to types approved by OFAC ("**Specially Designated Nationals and Blocked Persons**")) or otherwise. Seller is not now nor has it ever been, nor shall be at any time prior to the mutual execution and delivery of the Contract, a Person with whom a U.S. Person, including a "financial institution" as defined in 31 U.S.C. 5312 (a)(z), as periodically amended ("**Financial Institution**"), is prohibited from transacting business of the type contemplated by the Contract, whether such prohibition arises under United States law, regulation, executive orders and lists published by the OFAC (including those executive orders and lists published by OFAC with respect to Specially Designated Nationals and Blocked Persons) or otherwise;

2.      (A) Seller and each person or entity owning an interest in Seller is (1) not currently identified on the Specially Designated Nationals and Blocked Persons List maintained by the OFAC and/or on any other similar list maintained by OFAC pursuant to any authorizing statute, executive order or regulation (collectively, the "**List**"), and (2) not a person or entity with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or Executive Order of the President of the United States; (B) none of the funds or other assets of Seller constitute property of, or are beneficially owned, directly or indirectly, by any Embargoed Person (as hereinafter defined); (C) no Embargoed Person has any interest of any nature whatsoever in Seller (whether directly or indirectly); (D) none of the funds of Seller have been derived from any unlawful activity with the result that the investment in Seller is prohibited by law or that the Contract is in violation of law;  and (E) Seller has implemented procedures, and will consistently apply those procedures, to ensure the foregoing representations and warranties remain true and correct at all times;

3.      Seller will not use funds from any "Prohibited Person" (as such term is defined in the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism) to make any payment due to Tesla, and take such measures as are necessary to ensure that any funds used to pay amounts due to Tesla hereunder are derived (A) from transactions that do not violate United States law nor, to the extent such funds originate outside the United States, do not violate the laws of the jurisdiction in which they originated, and (B) from permissible sources under United States law and, to the extent such funds originate outside the United States, under the laws of the jurisdiction in which they originated;

4.      Seller: (A) is not under investigation by any governmental authority for, nor has it been charged with, or convicted of, money laundering, drug trafficking, terrorist-related activities, any crimes which in the United States would be predicate crimes to money laundering, or any violation of any Anti-Money Laundering Laws (as hereinafter defined); (B) has not been assessed civil or criminal penalties under any Anti-Money Laundering Laws; or (C) has not had any of its funds seized or forfeited in any action under any Anti Money Laundering Laws.

**Exhibit 1 – OFAC Compliance**

Seller represents and warrants as follows:

1.        Seller is not now and has never been nor shall it be at any time prior to the mutual execution and delivery of the Contract a Person with whom a U.S. Person is prohibited from transacting business of the type contemplated by the Contract, whether such prohibition arises under United States law, regulation, executive orders and lists published by the Office of Foreign Assets Control, Department of the Treasury ("**OFAC**") (including those executive orders and lists published by OFAC with respect to Persons that have been designated by executive order or by the sanction regulations of OFAC as Persons with whom U.S. Persons may not transact business or must limit their interactions to types approved by OFAC ("**Specially Designated Nationals and Blocked Persons**")) or otherwise. Seller is not now nor has it ever been, nor shall be at any time prior to the mutual execution and delivery of the Contract, a Person with whom a U.S. Person, including a "financial institution" as defined in 31 U.S.C. 5312 (a)(z), as periodically amended ("**Financial Institution**"), is prohibited from transacting business of the type contemplated by the Contract, whether such prohibition arises under United States law, regulation, executive orders and lists published by the OFAC (including those executive orders and lists published by OFAC with respect to Specially Designated Nationals and Blocked Persons) or otherwise;

2.        (A) Seller and each person or entity owning an interest in Seller is (1) not currently identified on the Specially Designated Nationals and Blocked Persons List maintained by the OFAC and/or on any other similar list maintained by OFAC pursuant to any authorizing statute, executive order or regulation (collectively, the "**List**"), and (2) not a person or entity with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or Executive Order of the President of the United States; (B) none of the funds or other assets of Seller constitute property of, or are beneficially owned, directly or indirectly, by any Embargoed Person (as hereinafter defined); (C) no Embargoed Person has any interest of any nature whatsoever in Seller (whether directly or indirectly); (D) none of the funds of Seller have been derived from any unlawful activity with the result that the investment in Seller is prohibited by law or that the Contract is in violation of law;  and (E) Seller has implemented procedures, and will consistently apply those procedures, to ensure the foregoing representations and warranties remain true and correct at all times;

3.        Seller will not use funds from any "Prohibited Person" (as such term is defined in the September 24, 2001 Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism) to make any payment due to Tesla, and take such measures as are necessary to ensure that any funds used to pay amounts due to Tesla hereunder are derived (A) from transactions that do not violate United States law nor, to the extent such funds originate outside the United States, do not violate the laws of the jurisdiction in which they originated, and (B) from permissible sources under United States law and, to the extent such funds originate outside the United States, under the laws of the jurisdiction in which they originated;

4.        Seller: (A) is not under investigation by any governmental authority for, nor has it been charged with, or convicted of, money laundering, drug trafficking, terrorist-related activities, any crimes which in the United States would be predicate crimes to money laundering, or any violation of any Anti-Money Laundering Laws (as hereinafter defined); (B) has not been assessed civil or criminal penalties under any Anti-Money Laundering Laws; or (C) has not had any of its funds seized or forfeited in any action under any Anti Money Laundering Laws.



**XL Group**
Insurance
Reinsurance

| | |
|---|---|
| **VERSICHERUNGSBESTÄTIGUNG** | **CERTIFICATE OF INSURANCE** |
| **BETRIEBS- UND PRODUKTHAFTPFLICHT** | **PUBLIC AND PRODUCT LIABILITY** |

Die dem unten genannten Versicherungsschein zugrunde liegenden Vertragsbedingungen werden durch diese Bestätigung weder ersetzt noch abgeändert.

Diese Bestätigung ist rein informativ und daraus kann in keinem Fall ein Recht abgeleitet werden. Für ausführliche Angaben wird auf den Original-Versicherungsschein verwiesen.

Nothing herein contained shall serve to alter, vary or waive the provisions of the Policy.

This letter is only for information and does not confer any rights upon the holder. For full particularities of the insurance please refer to the Policy document.

This certificate shall be considered as a translation of the original German version.

| | |
|---|---|
| Versicherungsnehmer / Policyholder: | Hoerbiger Deutschland Holding GmbH<br>Im Forchet 5<br>86956 Schongau<br>Germany |
| Weitere Versicherungsnehmer / Additional insured: | HOERBIGER Automotive Comfort Systems LLC<br>284 Enterprise Dr.<br>Auburn, AL 36830<br>USA |
| Empfänger des Zertifikates / Certificate holder: | Tesla Motors, Inc.<br>3500 Deer Creek Road<br>Palo Alto, California, 94304<br>USA |
| Versicherer / Insurer: | XL Insurance Company Plc, Direktion für Deutschland |
| Versicherungsschein Nr. / Policy number: | DE00009571LI / US00010580LI / US00010581LI |

**Deckungsumfang**

Versichert gilt die gesetzliche Haftpflicht des Versicherungsnehmers und/oder der Mitversicherten, die sich aus den versicherten Tätigkeiten, Eigenschaften und Rechtsverhältnisse ergibt, wegen

- Tötung, Körperverletzung oder anderer Gesundheitsschädigungen von Personen (Personenschäden)

- Zerstörung, Beschädigung oder Vernichtung von Sachen (Sachschäden)

**Scope of coverage**

This insurance covers subject to the limits and conditions of the above mentioned insurance contract the legal liability of the policyholder and/or the co-insured arising from the insured activities, properties and legal relationship in respect of

- death, bodily injury or other health impairments of persons (damage to persons)

- destruction, damage to or loss of property (property damage)

XL Insurance Company Plc, Direktion für Deutschland, Hauptbevollmächtigter: Michael Harth
Hauptsitz: XL House, 70 Gracechurch Street, GB-London EC3V 0XL
Sitz der Direktion für Deutschland: Hopfenstraße 6, 80335 München, Handelsregister München: HRB 137731
Für Umsatzsteuerzwecke: USt-ID-Nr.: DE 215535974, Versicherungsbeiträge sind umsatzsteuerfrei
i.S. des UStG und der 6. EG-Richtlinie.

Page 1 of 2



**XL Group**
Insurance
Reinsurance

| | |
|---|---|
| Der Versicherungsschutz richtet sich dabei nach den allgemeinen Versicherungsbedingungen für die Haftpflichtversicherung (AHB) sowie nach den besonderen Vereinbarungen des Vertrages, die den AHB vorangehen. | The insurance cover is governed by the General conditions for the Liability Insurance (AHB) and the special conditions of the Policy, which are preceding the AHB. |

| | |
|---|---|
| Örtlicher Geltungsbereich: weltweit inkl. USA/CA | Geographical Scope: worldwide incl. USA/CA |

**Deckungssumme**

Personen- und Sachschäden, pauschal

USD 10'000'000.00  je Versicherungsfall, höchstens
USD 10'000'000.00  für alle Versicherungsfälle im Versicherungsjahr.

**Limits of Indemnity**

Bodily injuries and property damages, combined

USD 10'000'000.00  any one occurrence, maximum
USD 10'000'000.00  for all occurrences any one year.

Versicherungsdauer / Period of Insurance:

Beginn / Inception Date: January 1st 2014

Ablauf / Expiry Date: January 1st 2015

Unterschrift des Versicherers / Signature of the insurer

Ort / Place: Zürich

Datum / Date: February 3, 2014

**XL Insurance Company Plc**
**Direktion für Deutschland**

XL Insurance Company Plc, Direktion für Deutschland, Hauptbevollmächtigter: Michael Harth
Hauptsitz: XL House, 70 Gracechurch Street, GB-London EC3V 0XL
Sitz der Direktion für Deutschland: Hopfenstraße 6, 80335 München, Handelsregister München: HRB 137731
Für Umsatzsteuerzwecke: USt-ID-Nr.: DE 215535974, Versicherungsbeiträge sind umsatzsteuerfrei
i.S. des UStG und der 6. EG-Richtlinie.



HOERBIGER America Holding Inc.
1358 W Newport Center Drive
Deerfield Beach, Florida 33442
Tel (954) 246-1340
Fax (954) 422-9872

## Commitment of HOERBIGER America Holding, Inc. regarding General Terms and Conditions for Prototype or Production Parts or Services Agreement with Tesla Motors, Inc.

HOERBIGER America Holding, Inc. ("Parent") hereby guarantees financial performance of all of the obligations of HOERBIGER Automotive Comfort Systems LLC ("Subsidiary") under that certain General Terms and Conditions for Prototype or Production Parts or Services (the "Agreement"), effective as of February 14, 2014, with Tesla Motors, Inc. ("Tesla"). Tesla shall be entitled to take any action against Parent under this guarantee in the event Subsidiary (i) undergoes insolvency proceedings, (ii) makes any voluntary or involuntary petition for bankruptcy protection, or (iii) otherwise fails or is unable to meet, in Tesla's reasonable determination, any of its financial obligations under the Agreement.

6. March 2014

**HOERBIGER America Holding, Inc.**

Dr. Martin Komlschke

Charles Friess

Franz Gruber

Heather Henderson